# A. LESCHEN & SONS ROPE CO. et al. v. BROWN.

## LAMSON & SESSIONS CO. v. SAME.
### Nos. 3638, 3648.

Circuit Court of Appeals, Fourth Circuit.
June 15, 1934.

Thomas W. Peyton, of Huntington, W. Va. (Simms & Staker and Peyton, Winter & Hereford, all of Huntington, W. Va., and Calfee & Fogg, of Cleveland, Ohio, on the brief), for appellants A. Leschen & Sons Rope Co., and D. A. Ensign.

Edward T. Butler, Jr., of Cleveland, Ohio, for appellant Lamson & Sessions Co.

Walter L. Brown, of Huntington, W. Va. (Daniel Dawson, of Huntington, W. Va., on the brief) for appellee.

Before PARKER and SOPER, Circuit Judges, and PAUL, District Judge.

SOPER, Circuit Judge.

These appeals are from a single order of the District Court confirming an order of the referee which disallowed claims filed by the three appellants against the bankrupt estate of West Virginia-Kentucky Hardware and Supply Company, a corporation, which was adjudicated bankrupt on July 26, 1932, upon its voluntary petition filed that day. So far as is here material, the claims are founded upon three notes made by one Beckner and indorsed by the bankrupt, to wit, a note for $16,767.88, payable to the Lamson-Sessions Company, another for $6,500, payable to A. Leschen & Sons Rope Company, and a third for $7,500, payable to the W. J. Parsons Estate. They are renewals of notes originally given on or about September 21, 1928, to the same parties who are the appellants here, in the respective sums of $25,000, $10,000, and $10,000, and later partially retired. The same question is presented as to each claim, namely, whether the indorsement of the bankrupt was ultra vires or unenforceable against its creditors; and since the original notes were all given under the same circumstances, the cases have been heard and argued together by consent and may conveniently be disposed of in a single opinion. It was held below that the indorsements were ultra vires the bankrupt.

There is no dispute as to the facts. The bankrupt was incorporated in 1923 under the laws of West Virginia, for the purpose of engaging in the business of buying and selling hardware and various lines of industrial and agricultural supplies. Its charter gave it the power to own and deal in stocks of other corporations, to own, buy, and sell real estate and buildings, and, in connection with its business, "to do any and all things that a natural person might do if engaged in any of the business aforesaid." The corporation established a plant at Huntington, W. Va., and another at Logan, W. Va., and carried on the intended business without interruption until 1928. On June 30th of that year, its balance sheet showed assets of $1,090,235.37, a net worth of $832,247.18, and a surplus of $136,547.18. Its capital was $695,700, represented by shares of $100 par value common stock, which was rather closely held.

In 1928, C. W. Beckner, the maker of the notes here involved, and at that time secretary of the corporation and owner of 435 shares of its stock, became desirous of purchasing the Huntington plant for himself, or for a corporation to be controlled by him. On July 24, 1928, he obtained an option on the Huntington plant at a price to be determined by the book value of fixed assets, plus the inventory value of current assets at the time of the exercise of the option. Of the cost so arrived at, an initial payment of $100,000 in cash was required, and the balance was to become due in 20 equal installments at intervals of three months. He was in addition to assume all obligations of the company, except its notes payable.

Beckner did not have the ready capital necessary to meet the $100,000 cash payment, and during the month of August he approached the appellants for the purpose of obtaining loans. He exhibited his option to each of them and told them generally of his plans. It was suggested to him by an officer of the Lamson-Session Company's predecessor in

business, which actually made one of the loans, that the proper method to evidence the loan would be for Beckner to give his personal note for the sum borrowed and to secure it by obtaining the indorsement of the corporation which was to take over the business; and also that the corporation should issue its preferred stock to Beckner in the amount of the loan, and that he should pledge the stock to secure his note. And it was later agreed with each of the lenders that the obligation should be undertaken and secured in the manner indicated, except that in the case of the Parsons estate, it was agreed that Beckner's wife should also indorse the note.

The purchase of the Huntington plant was carried out in September, though it did not take the precise form which seems previously to have been contemplated by the parties. On September 21, the bankrupt conveyed all its property to the Logan Hardware & Supply Company, a wholly owned subsidiary, except the outstanding stock thereof, consisting of 50 shares of common stock of the par value of $100, which were retained by the bankrupt. The Logan Company, which had previously been without assets, increased its capital stock to $700,000, and issued to the bankrupt 6,907 shares as consideration for the transfer besides assuming all the obligations of the bankrupt. The bankrupt then owned 6,957 shares of the Logan Company's stock, which exactly corresponded with the 6,957 outstanding shares of its own stock, and an offer was made to its stockholders to exchange their shares for stock in the Logan Company. All except Beckner and four others, who had by this time decided to go into his venture, agreed to the exchange, and their stock was surrendered and canceled. Beckner and his four associates, owning 1,160 shares of its stock, were thus left in control of the bankrupt, and Beckner was elected president of the corporation. Its authorized capital stock was immediately reduced to $400,000, divided into 2,000 shares of common stock and 2,000 shares of 7 per cent. preferred stock, of a par value of $100. The preferred stock had no voting rights.

Beckner then executed an assignment to the bankrupt of his option on the Huntington plant, and, by previous arrangement with the Logan Company, an agreement was entered into by which the bankrupt agreed to buy back the Huntington plant on the terms specified in the option to Beckner. The total price was fixed at $357,000, of which $75,000 was paid in cash, $25,000 was evidenced by a promissory note due December 1, 1928,

and secured by an issue of preferred stock in like amount, and the balance was payable in 20 equal installments, for which serial notes were given. The bankrupt was also given the right to apply its 1,160 remaining shares of Logan Company stock against the deferred payments at $120 per share, and assumed all liabilities of the Logan Company, except its notes payable. By this circuitous method, the two branches of the business were divided so that Beckner and his associates controlled the Huntington plant, and the balance of the stockholders became stockholders of the Logan Company which owned the Logan plant.

The segregation could not have been accomplished but for the loans made by appellants in accordance with the prior agreement with Beckner, and the proceeds of these loans, aggregating $45,000, were immediately deposited to the credit of the bankrupt and applied by it on the $75,000 first payment for the Huntington plant. Beckner gave his personal notes as agreed, and in order to enable him to secure them by the indorsement of the corporation and an issue of preferred stock, the directors passed the following resolution:

"Resolved, that in order to secure the necessary funds to make the cash payment to the Logan Hardware and Supply Company, carrying into effect the contract this day executed, C. W. Beckner, President, is hereby authorized to endorse for the company his personal notes given as follows: (The payees of the notes, with the amount due each, are here listed).

"It being further understood that funds to curtail the principal and pay the interest will be advanced to C. W. Beckner as requirements demand and charged on the accounts receivable of the company to C. W. Beckner.

"The preferred stock issued to C. W. Beckner and placed as additional security for the above-mentioned loans will be surrendered by him when all of the above notes have been fully paid and at the time of surrender the accounts receivable account for such funds will be cancelled. This transaction may in no way be construed as purely personal by C. W. Beckner but for the benefit of all stockholders pro rata with their several holdings."

The notes were indorsed by the corporation, by Beckner as president, and preferred stock of a par value equal to the face of the notes was issued to Beckner, and by him pledged to each of the lenders. As contem-

plated in the resolution above set forth, the bankrupt paid the interest on the notes as it fell due and in part retired the principal, charging such payments on its books as advancements to Beckner, in a special accounts receivable account. Two dividends declared on the preferred stock were credited to this account. The stock was carried on the books of the company as paid-up stock, and the balance sheets and statements ordinarily issued for credit purposes showed it as such; while the contingent liability of the corporation upon its indorsements of the notes was ordinarily not shown on its financial statements.

Upon these facts, the claims of the appellants against the estate of the bankrupt were rejected in the court below on the ground that the indorsement by the corporation of Beckner's notes was an ultra vires act; and the trustee in bankruptcy, in order to support the decision, now endeavors to show that the indorsement was given for Beckner's accommodation and did not serve any legitimate corporate purpose. It is pointed out that, before the transaction took place, the bankrupt corporation was in possession of a prosperous business with a substantial surplus, while afterwards the corporation was left with only a fraction of its former holdings; and so it is said that the liabilities incurred were not for its advantage, but solely for the benefit of Beckner and his associates. It is recognized that an ordinary business corporation has the power to give an accommodation indorsement if made for a proper corporate purpose; but it is contended that, none existing here, the general rule should be applied that such an indorsement is ultra vires and invalid. See Lyon, Potter & Co. v. First National Bank (C. C. A.) 85 F. 120.

We do not think that the evidence in the case warrants the conclusions which this argument involves. It cannot fairly be said that no corporate purpose was served, simply because much of the corporate property was disposed of in carrying out the transaction. The corporation had broad powers by its charter to own, buy, and sell real and personal property, and when those in control of the corporate organization determined to curtail its activities, and in good faith and without prejudice to the rights of creditors took the necessary steps in the manner approved by the statutes to accomplish the end in view, they were serving the purpose of the corporation none the less, when at the same time they served their own.

The specific steps which the corporation took in this instance were not beyond its power. We need not consider the extent of the corporate power to indorse negotiable paper for accommodation, because in this case the elements of accommodation were lacking in the indorsements which the corporation gave. Section 29 of the Negotiable Instruments Law (West Virginia Code of 1932, § 4341 [Code W. Va. 1931, 46-2-6]), defines an accommodation party as one who has signed an instrument without receiving value therefor, and for the purpose of lending his name to some other person. The resolution of the directors, which authorized the indorsement of the notes, expressly states that the indorsement was given in order to put the corporation in funds to make the cash payment on its contract for the purchase of the Huntington plant, and although the obligations in form were the notes of Beckner indorsed by the company, they were, in substance, the obligations of the company upon which, for its accommodation, Beckner appeared as maker.

This is not an instance, as in Schloss Bros. & Co., Inc., v. Monongahela Nat. Bank (C. C. A.) 60 F.(2d) 365, of an indorsement by a corporation of its stockholder's note simply for the purpose of enabling him to buy stock in the corporation. The preferred stock here was issued to Beckner for the purpose of enabling him to secure obligations that were owing by the company, and the stock was to be surrendered and canceled when the notes were paid. The transaction may perhaps be regarded as amounting in substance to a pledge by the corporation of its stock as collateral security for the loans. See In re United Educational Co. (C. C. A.) 153 F. 169; Burgess v. Seligman, 107 U. S. 20, 27, 36, 37, 2 S. Ct. 10, 27 L. Ed. 359; Granite Brick Co. v. Titus (C. C. A.) 226 F. 557, 567; Cook on Corporations (8th Ed.) 465. At any rate, the question of ultra vires must be here determined with reference to the corporation's power to borrow money and to execute negotiable instruments therefor. In the absence of charter or statutory prohibitions, a corporation has broad implied powers to borrow money for the purposes of its business, and it may bind itself by means of negotiable instruments for debts properly incurred. Pyles v. Furniture Co., 30 W. Va. 123, 133, 2 S. E. 909; Chicago, R. I. & P. Railroad Co. v. Howard, 7 Wall. 392, 412, 19 L. Ed. 117; Mahoney Mining Co. v. Anglo-Californian Bank, 104 U. S. 192, 194, 26 L. Ed. 707. There can be no doubt that the acquisition of property suitable to the

conduct of the business was a proper corporate purpose and the defense of ultra vires therefore cannot be sustained.

An alternate contention is that the case involves an attempt to require the corporation to repurchase some of its own stock, which, so far as the outside world knew, had been issued in the usual manner to a subscriber. The issue of the stock to Beckner, so that it might be pledged with the lenders, and the agreement of the corporation to pay off the loans, and thereupon to cancel the stock, without carrying the obligation on its books, certainly created a situation calculated to deceive creditors, and it may be that Beckner could not successfully resist a suit by the trustee for the par value of the stock, or press a claim against the insolvent corporation for the return of any payment on account of the stock which he may have made. We have recently had occasion to pass upon such a situation in Boggs v. Fleming, 66 F.(2d) 859, 860, where Judge Northcott said for the court: "The authorities are unanimous to the effect that, even though a corporation be solvent when it contracts to purchase its own stock, it may not later, upon insolvency, pay for it, until after the existing creditors have been paid, and in no event can such purchase be upheld in bankruptcy when it is in fraud of the rights of other creditors."

An examination of the authorities cited will show that the result is the same whether the agreement of the corporation to purchase is contemporaneous with the subscription, or is not made until some later time. Moreover, the rule applied in these cases is embodied in section 3051 of the West Virginia Code 1932 (Code W. Va. 1931, 31-1-39), which empowers corporations of that state to purchase their own stock, provided that "no such corporation shall use its funds or property for the purchase of its own shares of capital stock when such use would cause any impairment of the capital of the corporation. * * *" And see Acker v. Girard Trust Co. (C. C. A.) 42 F.(2d) 37, construing a provision of the Delaware Code from which this section was adopted. See, also, West Virginia Code 1932 § 3052 (Code W. Va. 1931, 31-1-40).

The difficulty with this method of approach is that the appellants are not seeking to enforce the corporation's agreement to repurchase or cancel its own stock, and there is no evidence that they had any knowledge that the corporation had agreed to do so. The testimony shows only that it was suggested by one of them, and agreed by all, that Beckner's notes be indorsed by the corpora-

tion, and that preferred stock be issued to him and pledged with them as additional security. Such an arrangement is consistent with the idea that Beckner had in fact made an unconditional subscription to the capital of the corporation, and that the lenders desired some security from which they might obtain satisfaction of their claims without resort to litigation. In short, we do not find any evidence that the lenders knowingly participated in an arrangement which was intended to deceive or injure the creditors of the corporation or was likely to produce this result; and it follows that they are entitled to the recognition of their claims in the distribution of the assets of the bankrupt estate.

The order of the District Court is reversed.