Louis M. Hauben and Others, etc., Plaintiffs, *v.* Arthur J. Morris and Others, Defendants.

Supreme Court, Special Term, New York County, November 18, 1936.

*Frank Aranow* and *Harry A. Gair* [*Harris Berlack, Benjamin H. Siff* and *Solomon I. Cohen* of counsel], for the plaintiffs.

*Satterlee & Canfield* [*R. Randolph Hicks, Lloyd F. Thanhouser* and *James L. Robertson* of counsel], for the defendants.

PECORA, J. The plaintiffs are stockholders of the Industrial Finance Corporation. They bring this action in equity on their own behalf and on behalf of all other stockholders similarly situated, against certain of the directors of the corporation, to recover on behalf of the corporation moneys alleged to have been acquired by the directors with others, in violation of the fiduciary duty which such directors owed to the corporation. While the trial lasted many days and the evidence is voluminous, the essential facts may be simply stated.

Industrial Finance Corporation is a holding company. It was organized in Virginia in 1914 for the purpose of forming and controlling so-called Morris Plan banks throughout the country. Its prime mover in its processes of organization and expansion

was the defendant Arthur J. Morris. Its strongest individual financial supporter was one John Markle, a capitalist who died before this action was commenced. Something like one hundred banks were established under its sponsorship throughout the country. In 1919 it branched out into the business of financing the retail purchase and sale of Studebaker automobiles.

Owing to the rapid expansion of its business, it required additional capital. This was obtained in 1922 by selling to Markle $2,000,000 par value of six per cent bonds at 95. The total authorized issue of bonds was $2,500,000. They were secured by approximately $3,500,000 worth of collateral, consisting in the main of stock of the various Morris Plan banks.

In 1924 the corporation transferred its automobile sales financing business to a subsidiary called Industrial Acceptance Corporation. At about this time negotiations were entered into with Markle by the Industrial Finance Corporation for the exchange of his secured bonds for a preferred stock issue. As a result thereof, on January 30, 1925, the corporation purchased about $50,000 of Markle's bonds, and for the balance thereof exchanged $1,805,000 par value of so-called debenture stock, for the issuance of which it had obtained the necessary stockholders' authority. This debenture stock was in the nature of a preferred stock and took precedence over all the other issues of the corporation. It bore cumulative dividends at the rate of seven per cent per annum, and was preferred upon a distribution of assets at the figure of $105 per share. It was redeemable on any interest date after three years from the date of issuance at $105 and accrued interest. The interest dates were May first and November first. In the event of default in the payment of two dividends, the debenture stock was given the right to elect a majority of the board of directors; otherwise it had no voting power.

At the time of this exchange it was agreed that the corporation would repurchase from Markle, within twenty days after his demand, $250,000 par value of the debenture stock at par and accrued interest; and also that it would purchase annually for six years beginning in January, 1926, $100,000 par value of the debenture stock at 105 and accrued dividends. To enable it to carry out this agreement, provision was made by the corporation for a sinking fund of ten per cent of its annual net earnings, not exceeding $100,000 a year; and a sinking fund agreement was entered into with a bank. It was further agreed that, while the debenture stock was outstanding, the corporation would not create any " security, mortgage or bond issue ranking ahead of the six per cent bonds or the

seven per cent debenture stock issue which shall be a lien on the stocks now in trust as security for the collateral trust gold bonds during the life of the same." It was further understood that the corporation would have the right to use those stocks for the purpose of securing bank loans made in the usual course of business from time to time.

It is of the utmost importance to bear in mind that the corporation was actually obligated to purchase or redeem this debenture stock. It did, in fact, purchase 2,500 shares thereof from Markle at par on April 11, 1925, and 1,000 shares at 105 on February 1, 1926. This left on the last-named date 14,550 shares of the debenture stock in Markle's hands. Of this amount the corporation was under the obligation to purchase or redeem a thousand shares annually, and the entire balance on or before January 31, 1932, all at the price of 105.

Some time in 1925, and continuing until about the fall of 1926, disagreements arose between Morris and Markle, not only over personal matters, but also with respect to the corporation's policies. These engendered much bitterness and acrimony, and culminated in a stormy interview between them at Markle's office in the summer of 1926, at the end of which Markle ordered Morris out of his office.

Mutual friends, who were directors of the corporation, undertook various efforts at peacemaking between them, all of which apparently failed. Finally, on September 15, 1926, on the recommendation of Morris, who was president of the corporation, the board of directors abolished the office of chairman of the board of directors, which Markle then filled, and appointed a committee to consider the possibility of Markle's removal altogether as a director. Markle thereupon consulted his personal attorney, with a view to the adoption of defensive and retaliatory measures. His attorney suggested to him as an alternative that Markle sell out all of his holdings in the corporation and its affiliates, and endeavor to effect an arrangement whereby he would be permitted to resign from his various offices in the corporation and its affiliates, instead of facing removal therefrom. Apparently, Markle became willing to adopt this suggestion. Accordingly, on September 20, 1926, his counsel met Morris and the defendant Hicks, the latter of whom was a director of the corporation and one of its counsel, and made those proposals to them. Markle's holdings at that time included blocks of common stock, in addition to the 14,550 shares of debenture stock. It also included shares in other companies affiliated with the corporation.

Eventually, on November 24, 1926, after various conferences between Morris, Hicks and others, with Markle and his attorney, a syndicate was formed, largely through the activities of Morris and other directors of the corporation, to purchase Markle's holdings. This syndicate was composed of about twenty-one persons, eleven of whom, including Morris and Hicks, were then directors of Industrial Finance Corporation, and two of whom became such directors before the conclusion of the syndicate's subsequent transactions with the corporation.

On December 20, 1926, the syndicate entered into a written agreement with Markle for the purchase of his holdings. In this agreement the holdings were divided into two groups, called, respectively, parcel A and parcel B. Parcel A consisted solely of the 14,550 shares of the debenture stock, and the purchase price therefor was $95 per share, or $1,382,250. Parcel B consisted of all the other issues of the corporation and its subsidiaries and affiliates then held by Markle, and the purchase price therefor was the lump sum of $542,750, making a total purchase price for both parcels of $1,925,000. A down payment of only ten per cent, or $192,500, was required to be made by the syndicate under the agreement and various other subsequent installment payments were provided for. The final payment by the syndicate for the parcel A, or debenture stock, became due on May 1, 1928, and the final payment for the parcel B stocks was fixed for June 1, 1928.

The syndicate, however, completed the purchase of these holdings from Markle on August 18, 1927, or between nine and ten months prior to the date fixed by the agreement. With the exception of the original ten per cent, or $192,500, the moneys paid by the syndicate to Markle for the debenture stock were borrowed from two banks. The executive head of one of these banks was actually a member of the syndicate. The collateral given to the two banks for these loans consisted of the debenture stock itself.

On February 1, 1928 — which was the day following the closing of the fiscal year of the Industrial Finance Corporation — the syndicate owed the two banks on account of these loans the respective sums of $595,000 and $259,738.94. On that date these loans were fully paid by the syndicate, and the debenture stock which the banks held as collateral was thereupon delivered by them to the syndicate. The money required for the liquidation of these loans was obtained by the syndicate through a loan made to it on that date — February 1, 1928 — by the Industrial Finance Corporation in the greater sum of $1,190,445. And again the security given by the syndicate for this loan was the debenture stock itself. This loan of nearly $1,200,000 by the corporation to the syndicate

was made easily possible, because in the preceding fall and during the life of the agreement between the syndicate and Markle, the corporation had floated a bond issue of $4,500,000 in the name of a newly-created and wholly-owned subsidiary called Morris Plan Shares Corporation through a bankers' group which included some of the syndicate members. Indeed, the prospectus issued by the bankers in offering these bonds to the public specifically stated that one of the purposes of the issue was " the retirement and/or purchase of the debenture stock if deemed advisable by Industrial." This circumstance is worthy of special note because of the contention of defendants that the Industrial Finance Corporation was not in a position to finance the purchase of the debenture stock from Markle. By May 1, 1928, and nearly four years prior to the time when it was obligated to do so, the corporation redeemed these shares of debenture stock at 105, with a resultant profit to the syndicate of $145,500 plus dividends.

The precise problem presented to this court for determination is whether or not the defendants are answerable to the corporation for the profits realized by the syndicate on the securities purchased by it from Markle. Reliance is had, to sustain the views of the plaintiffs on the well-established rule in equity that when directors are under a duty to purchase properties on behalf of their corporation, and instead they purchase the property for themselves, they become liable to the corporation for any profits made as a result of the transaction, such property in their hands being impressed with a trust in favor of the corporation. The defendants do not contest the soundness of this rule, nor do they deny that it is a principle of general application. But they stoutly maintain that the special circumstances of this case render it inapplicable to the facts here involved.

It is first contended by defendants that the Industrial Finance Corporation was without legal power to purchase from Markle the securities which he held, and that because of this lack of legal power the directors were under no duty to purchase these securities for the corporation. The argument is based on the claim that the corporation did not have a surplus sufficiently large to permit it to purchase these securities, and that the securities could be purchased by the corporation only out of its surplus. ( *United States Mineral Co.* v. *Camden & Driscoll*, 106 Va. 66; 56 S. E. 561; *Grace Securities Corporation* v. *Roberts*, 158 Va. 792; 164 S. E. 700; *Kennerly* v. *Columbia Chemical Corporation*, 137 Va. 240; 119 S. E. 265.) While there is some doubt as to whether the debentures held by Markle were stock which could be purchased only out of surplus, or whether they were essentially bonds, it is abun-

dantly clear that the principles upon which the defendants estimate the corporation's surplus are unsound, and that as a matter of fact the corporation had an adequate surplus with which to make this purchase on either theory. The surplus account of the corporation as of January 31, 1927, shows it as $2,858,330.79. This was more than enough to consummate the deal with Markle. The defendants say there should be deducted from this figure the sum of $1,251,598.21, on the ground that this portion of the surplus resulted from the appreciation in value of capital assets and did not accrue from profits. It is settled, however, that the increased value of capital assets may be considered as part of the surplus. (*Equitable Life Assurance Soc.* v. *Union Pacific R. R. Co.*, 212 N. Y. 360.) The defendants also point to the fact that among the assets of the corporation was an intangible asset, " The Morris Plan," valued at $1,000,000, which they likewise think should be deducted from the surplus account. It is impossible to reconcile this claim with the subsequent action of the corporation on May 1, 1928, in purchasing this very debenture stock from the syndicate, for even at that time, according to the defendants' calculations, its surplus would have been inadequate.

It is also urged by the defendants that, regardless of the presence or absence of an adequate surplus with which to consummate the transaction with Markle, the corporation was without financial means to do so. Again, the evidence before the court indicates that the terms upon which the syndicate made the purchase from Markle could readily have been met by the corporation itself. The down payment of $192,500, required by the agreement with Markle, could easily have been met out of the cash reserves of the corporation, and the subsequent steps which, in the main, consisted of hypothecating the very securities purchased from Markle, could have been taken by the corporation as well as by the syndicate. In any event, there is no satisfactory evidence to show that the financial steps adopted by the syndicate could not likewise have been followed by the corporation.

The essential duty of a director is to exert his every effort on behalf of the corporation which he serves. He is indeed, its trustee for that purpose. It is, therefore, a sound rule which prohibits a director from purchasing for himself property which he is under a duty to purchase for his corporation. Nor is this rule any less applicable when the corporation is financially unable to purchase the property which it desires. Judge SWAN, writing for the Circuit Court of Appeals in *Irving Trust Co.* v. *Deutsch* (73 F. [2d] 121; certiorari denied, 294 U. S. 708), said (at p. 124): " The

main defense asserted is that the Acoustic by reason of its financial straits had neither the funds nor the credit to make the purchase and that the directors honestly believed that by buying the stock for themselves they could give Acoustic the advantage of access to the DeForest patents, while at the same time taking a stock speculation for their own benefit * * *. If directors are permitted to justify their conduct on such a theory there will be a temptation to refrain from exerting their strongest efforts on behalf of the corporation since, if it does not meet the obligations, an opportunity of profit will be open to them personally."

The case before me is one in which the principle stated by Judge SWAN finds ready application, for the evidence shows that at least some of the defendant directors informally and without consulting the corporation in the regular way apparently concluded that the corporation was financially unable to purchase the Markle holdings. Such a course of conduct is inconsistent with the fiduciary duty under which the directors must serve.

It is further claimed by the defendants that Markle categorically refused to sell his securities to the corporation, but insisted that he would sell only to a syndicate. The testimony in this regard virtually comes only from Mr. Morris and is not corroborated by any fact or circumstance proved at the trial. In fact, Markle's attorney, the very person who it is alleged communicated the information to Morris that Markle would not sell to the corporation, could remember no such thing. Moreover, the evidence indicates that this is highly improbable, for Morris himself testified that before and after, as alleged by him, Markle's attorney had stated that Markle would sell only to a syndicate, he had made efforts to purchase these securities on behalf of the corporation. Certainly such efforts would have been pointless had it been apparent that Markle would under no circumstances sell to the corporation. Nor is there anything in the record to show that Morris or his associates ever attempted to alter the determination that it is now alleged Markle had, not to sell to the corporation. But even if it were true that Markle had stated that he would not sell to the corporation, it was for the corporation itself and not for Morris and his associates to take his statement as final and conclusive and to drop out of the situation on that account.

It is also argued very strongly by defendant that Markle refused to sell the debenture stock unless all of his other securities were likewise disposed of, and that the corporation had no need and no desire to purchase the other securities and was under no obligation to do so. As a matter of fact, counsel for the defendants now assert that it would have been an inexcusable squandering

of corporate funds for the corporation to buy securities other than the debenture stock. It is of course possible that a corporation which desires to purchase some property or securities might in good faith reject an offer thereof because of onerous conditions or financial inability to meet its terms. The difficulty with this claim is that the corporation was actively attempting to purchase these very securities. As heretofore stated, Morris testified both at the trial and in an examination before trial that he made many efforts to finance the purchase on behalf of the corporation of all the securities which Markle owned, including these very securities which it is now asserted would have been an inexcusable squandering of corporate funds for the corporation to buy. In any event, here again the matter is not one with regard to which Morris was entitled to use his own judgment. It was a matter which the corporation only could decide for itself. There is nothing in the record to show that the directors of the corporation were ever convened at a meeting and formally presented with the problem or formally acted upon it. It is well settled that a corporation can only act through its board of directors at a formal meeting and in a formal way (*Landers* v. *Frank Street Methodist Episcopal Church*, 114 N. Y. 625); and indeed this is a salutary rule, for the stockholders are entitled to the deliberative judgment of their directors and their deliberate determination, based on circumstances and facts duly and formally presented to them. It is not sufficient that the directors informally and without holding a meeting express opinions to each other in separate conversations and agree upon a course of conduct. Their duty to the corporation is to meet together and to consider the various problems concerning the corporate affairs. Especially is this a salutary rule where the question at issue is one involving conflicting interests of the directors themselves and the corporation. In such a case nothing less than the clearest action of the corporation in a regular manner, free from opportunity for improper influence or manipulation, can meet the obligation of fiduciary responsibility.

The evidence here shows that while a stockholders' meeting was held which formally approved the purchase of the securities by the corporation from the syndicate, the stockholders were never informed either of the details of the transaction or of the fact that the members of the syndicate whose debentures they were purchasing included many of their own officers and directors.

These objections thus raised by the defendants do not in any way affect the applicability of the general rule, above stated, that the directors of a corporation who are under a duty to purchase certain properties for the corporation and who in violation of that

duty purchase these properties for themselves, must account to the corporation for the profits. (*New York Trust Co.* v. *American Realty Co.*, 244 N. Y. 209; *Billings* v. *Shaw*, 209 id. 265; *Robinson* v. *Jewett*, 116 id. 40.) At least, as far as the debenture stock was concerned, these defendants were under a clear duty to make the purchase on behalf of the corporation. They knew that the corporation had been negotiating for this purchase; they knew that the corporation was definitely obligated to redeem these securities at 105; they knew that the corporation intended or was obliged to purchase the securities on or before their due date; they knew that the best interests of the corporation dictated that Markle's holdings be acquired or retired. Yet in spite of this knowledge they formed a syndicate and acquired the securities for themselves and resold them to the corporation at a substantial profit.

But quite apart from the rule referred to, and irrespective of the duty of the directors to purchase for the corporation, it is also a well-settled principle that whenever directors participate in a scheme to purchase property with the intention of reselling it to the corporation of which they are directors, they must resell at cost. The basis of this rule is the principle that directors must never act in a way that will or may create a clash between their own personal interests and the interests of the corporation which they serve. The Court of Appeals in *New York Trust Co.* v. *American Realty Co.* (*supra*) explicitly adopted this principle when it said: " Here the allegations of the counterclaim may be construed as stating that Underwood bought with intention to resell to the corporation. That he might not do. Having so bought, he was under duty, on request of the corporation, to transfer the property to the corporation at cost."

The defendants assert, however, that this rule does not have any application to the purchase of corporate securities consisting of bonds and stock, but that it applies only to the purchase of other types of property. They rely upon the decision of the Court of Appeals in *Seymour* v. *Spring Forest Cemetery Assn.* (144 N. Y. 333), where it was held that the directors of a corporation may purchase the bonds of a corporation on their own behalf. But that case does not sustain their position. There the directors did not purchase with intent to resell, but merely with the intent to hold to maturity. And the essential point of that case, and other cases of like nature, is not that the property there consisted of bonds, but that the circumstances under which the defendants there purchased the property created no clash between the personal interest of the director involved and the interests of the corporation. This

is recognized by the court itself (p. 344): " The entire basis of the rule consists of this collision between trust duty and personal interest, and the equitable prohibition has no application where there is no such possible inconsistency. There is no such conflict in the ordinary case of the purchase by a director in a going. corporation of its outstanding obligations. There is no present duty resting upon him to extinguish them. The time for that has not come, the duty has not arisen, may never arise, the corporation is not prepared to pay, does not contemplate paying, but intends and expects to await full maturity of the debt. Unless some special fund has been provided * * * the director owes no duty to his company to discharge or buy in the outstanding bonds, and may purchase for himself because no inconsistent trust duty has arisen."

Obviously by this language the Court of Appeals did not mean to challenge the soundness of the rule stated subsequently by that court in the *New York Trust Co. Case* (*supra*) that where the intent of a director in the purchasing of property is to resell it to the corporation, he must resell at cost; for clearly in such cases the director is creating a situation where there is or may be a clash between his interests and those of the corporation which he represents as its fiduciary.

The redemption of the debenture stock by the corporation was so accomplished as to make it in substance a sale of this stock by the members of the syndicate to the corporation, of which most of them were directors. It was consummated nearly four years before the corporation was obliged to purchase or redeem the greater part of the debenture stock. To effect the redemption the board of directors of Industrial Finance Corporation, at a meeting held March 6, 1928, adopted a resolution recommending the redemption and called a stockholders' meeting to consider the proposition. The proposal was adopted in form any way, at a stockholders' meeting held March 22, 1928. At the directors' meeting eight members of the syndicate were present. Without them there would have been no quorum. At the stockholders' meeting more than a majority of the stock was voted in favor of redemption by voting trustees, four out of five of whom were members of the syndicate and directors of the corporation. The fifth was a partner of the general counsel to the corporation, who was both a director and a member of the syndicate. With the stock held by the defendant Morris personally, the members of the syndicate voted more than two-thirds of the voting stock in favor of redeeming the debenture stock held by the syndicate. It is well settled that where a corporate officer or director represents the

corporation in consummating a transaction which results in a profit to himself, he is accountable to the corporation for the profit realized. (*Munson* v. *Syracuse, etc., R. R. Co.*, 103 N. Y. 58; *Globe Woolen Co.* v. *Utica G. & E. Co.*, 224 id. 483; *New York Trust Co.* v. *American Realty Co.*, *supra*.) This is but an illustration of the general principle that " a person who undertakes to act for another in any matter shall not, in the same matter, act for himself." (*Dutton* v. *Willner*, 52 N. Y. 312.) This principle and the rules dependent upon it are operative irrespective of the motives or good faith of the director who undertakes to represent the corporation in dealing with himself. (*Dutton* v. *Willner, supra; Munson* v. *Syracuse, etc., R. R. Co., supra*.) The circumstances of the redemption of the debenture stock bring this case squarely within the principle thus enunciated.

In the instant case the profits which accrued to the syndicate included the intervening dividends paid upon the debenture stock. The authorities in support thereof are quite ample. The rule was well stated in *Du Pont* v. *Du Pont* (242 Fed. 98, 136, 137), in language peculiarly appropriate to this case, as follows:

" When a director attempts in violation of his duty to acquire interests adverse to the corporation in respect to any matter involved in the confidence which has been reposed in him, as to which equity imposes a disability upon him to deal in his own behalf, the court will hold him as a trustee for the corporation, and he must account for the profits which otherwise would have accrued to the corporation. The product of the transaction will belong to the corporation exclusively. * * *

" There never has been, however, any corporate action determining whether or not the company should purchase the stock. If such had been taken, the remedy afforded to the plaintiffs would properly be a decree declaring it to be the duty of the defendants to assign and transfer the stock to the E. I. du Pont de Nemours & Co. upon reimbursement of the cost of acquiring it and an accounting for dividends received thereon, or in case it should be found that the stock could not for any reason be transferred to the E. I. du Pont de Nemours & Co., an accounting for the difference between the cost and the fair market value of the stock, together with the dividends received thereon."

To the same effect is *Backus* v. *Finkelstein* (23 F. [2d] 357).

In *Briggs* v. *Kennett* (8 Misc. 264; affd., 149 N. Y. 577) stock belonging to a customer was converted by a broker's agent. In computing the damages, dividends upon the stock were included, the loss of dividends being " a direct and necessary result of this breach of contract."

In *Gammon* v. *Dain* (238 Mich. 30; 212 N. W. 957) a director had purchased stock from a stockholder, without disclosing to him that a large and profitable transaction was impending. After the sale the corporation declared a substantial dividend out of the profits from the transaction referred to. The court held that this dividend equitably belonged to the stockholder and required the director to account for it.

In *Ball* v. *Hopkins* (268 Mass. 260; 167 N. E. 338) a trustee sold the *cestui's* interest in a partnership for preferred stock in a corporation, and at the same time sold his own interest for common stock. While the preferred stock paid only five per cent, the common stock paid large dividends. The trustee was held liable to account in such fashion that the *cestui* would receive an equal share in the profits of the transaction, including the dividends on the common stock.

In *Bromschwig* v. *Carthage Marble & White Lime Co.* (334 Mo. 319; 66 S. W. [2d] 889) the defendant borrowed money from a corporation with which he purchased shares of its own stock. Although the loans were repaid, the court held that the corporation was entitled to recover the defendant's secret profits, including several large dividends paid by the corporation in the interim The court said that "it is fair to assume that most, if not all, of the money that was used to pay the appellant's debt to the company was obtained from the company."

The situation is not dissimilar from that in which a corporate director obtains a lease for himself which he should have obtained for the corporation. The remedy in that case is to require him to assign the lease to the corporation and to account for the rents received in the interim. (*Carpenter* v. *Carpenter*, 131 N. Y. 101; affd., 58 Hun, 608; *McCourt* v. *Singers-Bigger*, 145 Fed. 103 [C. C. A. 8th Circuit].)

The directors here are being required to account for the profit realized upon the debenture stock on the theory that they purchased the stock as trustees for the corporation. They should have assigned it to the corporation at cost. In view of their present inability to do so, they are required to pay over to the corporation all amounts over and above what they paid. They paid $95 per share. They received $105 plus the intervening dividends.

While it is thus clear that the defendants must be charged with the profits earned on the purchase of the debenture stock, the situation respecting the other securities purchased by the syndicate from Markle cannot be treated in a like manner. With regard to these other securities, the corporation was under no obligation to redeem; and while it might have been willing to buy them in order to obtain the debenture stock, and Morris testified some efforts

were made to enable it so to do, its purchase was not a primary or independent object of these efforts. I am of opinion that the directors might properly have bought the other securities for their own account, and hence are not answerable to the corporation for any profits alleged to have been made by them out of these other securities.

The nature of the liability of the defendants in this case and the extent of the recovery against them is our next and final consideration. Here, the applicability of the general rule that directors are jointly and severally liable to account for profits earned by breach of their fiduciary duty cannot be gainsaid. Nor does the fact that part of the profits were earned by members of the syndicate who were not directors of the corporation, change this result. Mr. Justice BRANDEIS, speaking for the Supreme Court of the United States in *Jackson* v. *Smith* (254 U. S. 586, at p. 588) stated the rule as follows: " When he agreed with Smith and Wilson to join in the purchase if Wilson should become the successful bidder, he placed himself in a position in which his personal interests were, or might be, antagonistic to those of his trust. *Michoud* v. *Girod*, 4 How. 503. It became to his personal interest that the purchase should be made by Wilson for the lowest possible price. The course taken was one which a fiduciary could not legally pursue. *Magruder* v. *Drury*, 235 U. S. 106, 119, 120. Since he did pursue it and profits resulted the law made him accountable to the trust estate for all the profits obtained by him and those who were associated with him in the matter, although the estate may not have been injured thereby. * * * And others who knowingly join a fiduciary in such an enterprise likewise become jointly and severally liable with him for such profits. * * * Wilson and Smith are therefore jointly and severally liable for all the profits resulting from the purchase; the former, although he had no other relation to the estate; the latter, without regard to the fact that he was also counsel for the receiver."

This joint and several liability dictates the conclusion that the entire profits of the syndicate on the debenture stock purchased from Markle may be recovered from the defendants. The syndicate purchased 14,550 shares at 95, and resold the same to the corporation at 105, thus making a profit of $145,550, plus the dividends paid thereon, for which, together with the interest thereon, they are answerable to the corporation.

It cannot be too frequently emphasized by the courts that a director of a corporation is a fiduciary. His duties are those of trust, because in his hands lies the management of other people's money. It is well to call to mind the virile statement in 1934 of

that distinguished jurist of the Supreme Court of the United States, Mr. Justice STONE: " I venture to assert that when the history of the financial era which has just drawn to a close comes to be written, most of its mistakes and its major faults will be ascribed to the failure to observe the fiduciary principle, the precept as old as Holy Writ, that ' a man cannot serve two masters ' * * *. The separation of ownership from management, the development of the corporate structure so as to vest in small groups control of the resources of great numbers of small uninformed investors, make imperative a fresh and active devotion to that principle if the modern world of business is to perform its proper function." (48 Harvard Law Review, p. 8.)

The present generation has witnessed the enormous development of corporate business — an expansion which is increasingly current. The money of large numbers of our people is thereby drawn into it in greater and greater volume. Owing to the elements inherent in the operation of business corporations, the vast majority of their stockholders can exercise but the slightest measure of individual power and judgment in their actual conduct. They must perforce, look to their officers and directors therefor. These persons are the servants of the stockholders. More than that, they are wholly and unqualifiedly trustees. Inevitably it is the duty of the courts to enforce all the obligations implicit in that fiduciary relationship. The rules of law herein considered were born out of the abundance of a necessity shown by experience to exist, in order to give protection to those who, without a scrupulous enforcement of those rules, might otherwise be helpless against spoliation by their own trustees and servants.

Submit findings in accordance with this opinion.