MOUNTAIN STATE STEEL FOUND-RIES, INC., Petitioner and Cross-Respondent,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent and Cross-Petitioner.

No. 8059.

United States Court of Appeals Fourth Circuit.

Argued April 26, 1960.

Decided Nov. 7, 1960.

Joseph W. Kiernan, Washington, D. C. (Robert P. Smith, D. A. Baker, and Smith, Ristig & Smith, Washington, D. C., on brief), for petitioner and cross-respondent.

Harold M. Seidel, Atty., Dept. of Justice, Washington, D. C. (Howard A. Heffron, Acting Asst. Atty. Gen., and Lee A. Jackson and Harry Baum, Attys., Dept. of Justice, Washington, D. C., on brief), for respondent and cross-petitioner.

Arthur J. Goldberg, Gen. Counsel, Elliot Bredhoff, Assoc. Gen. Counsel, United Steelworkers of America, Carolyn E. Agger, Sheldon S. Cohen, and Stevenson, Paul, Rifkind, Wharton & Garrison, Washington, D. C., on brief, for United Steelworkers of America as amicus curiae.

Before SOBELOFF, Chief Judge, and SOPER and HAYNSWORTH, Circuit Judges.

### HAYNSWORTH, Circuit Judge.

Deficiences of income tax for the fiscal years 1951–1954 were asserted against this corporate taxpayer upon (1) the disallowance of deductions for interest paid upon notes given in part payment of the purchase price of the stock of dissident stockholders upon the ground that the stock purchase agreement impaired the capital of the corporation and was invalid under state law, and (2) the assessment of the penalty tax of § 102 of the 1939 Code, 26 U.S.C.A. § 102 upon the ground that by the redemption of the stock the corporation had been availed of for the purpose of avoiding surtaxes upon its remaining shareholders by accumulation of earnings. In an unreviewed decision, the single judge of the Tax Court sustained the commissioner upon both questions.

Since we are of the opinion there was no income tax deficiency, we do not consider the Tax Court's computation of the undistributed section 102 net income, a computation with which both parties find fault.

The transaction which gave birth to these problems was consummated in an effort to resolve difficulties arising out of the death of a partner in an antecedent partnership. The story should start with the beginning.

Ben Miller and Harold F. Stratton, of Parkersburg, West Virginia, were the principal partners in a partnership engaged in manufacturing steel castings. Miller died in 1945, and his widow and two daughters then became owners of his fifty per cent interest in the partnership, the other fifty per cent interest being owned by Stratton, his sister and two nephews.

On July 1, 1947, the business was incorporated. Mountain State Steel Foundries, Inc., the taxpayer acquired all of the partnership assets in exchange for which it issued one thousand shares of its common stock, having a par value of $100 each, to the Millers [1] and a like number of shares to the Strattons. It assumed all of the partnership obligations.

The Millers were not happy with the situation. Except that Mrs. Miller was a member of the Board of Directors, they took no active part in the conduct of the business, but felt the need of larger and more certain income than prospective dividends would provide. The business is said to have been subject to wide fluctuations in earnings. Additionally, the Strattons, who were active in the business and derived income from it through salaries, were interested in expanding and improving the business and its fixed assets and in utilizing a portion of current earnings in good years for that purpose.

This conflict in the interests of the stockholders led Mrs. Miller to demand that the business be sold. Stratton sought to find a purchaser for all of the stock or the corporate assets on a basis which would enable the stockholders to realize $1,700,000. Later, he reduced his asking price to $1,500,000. Some people

---

1. 500 shares were issued to Mrs. Miller, the widow of Ben Miller, and 250 shares to each of the two daughters.

were interested in the plant, but not at those prices.

In 1950, an accountant, who did work for the taxpayer and its stockholders, suggested to Mrs. Miller that the corporation might buy the Miller stock if she and her daughters would accept payment over a substantial number of years. Mrs. Miller thought well of the idea, and approached the Strattons about it. An agreement was then worked out for the corporation to purchase all of the Miller stock at a price of $450,000, payable $50,000 in cash and the balance, with interest at four per cent per annum, payable in level payments of $11,000 each six months until April 1, 1977 and of $5,000 each six months thereafter until April 1, 1994.[2]

The corporation has met its maturing obligations under these notes. The interest increment of its payments during its fiscal years 1951–1954, respectively, was $11,969.99, $15,757.00, $15,504.77 and $15,242.37. On its income tax returns for those years it deducted those amounts as interest paid.

The Commissioner disallowed these deductions on the theory that the purchase of the stock impaired the capital of the corporation in violation of § 3051(31–1–39) of the West Virginia Code of 1955 and that, because of that statute, the obligations with respect to which the interest was paid were unenforceable and invalid. He further imposed the § 102 tax on the theory that, since the Strattons might have bought the stock, had the Millers been willing to accept their personal obligations, and declared additional dividends to provide them with funds to meet their individual obligations, the corporate redemption of the Miller stock established, during each of the tax years, a use by the Strattons of the corporation for the avoidance of personal surtaxes by corporate accumulation of income.

After the Tax Court approved the Commissioner's theories on both aspects of the case, the taxpayer brought an action in the state court against the Millers seeking a declaratory judgment as to its obligations. This proceeding resulted in a decree of the Circuit Court of Wood County, West Virginia, in which it was held that the redemption of the stock did not impair the capital of the corporation within the meaning of § 3051 of the West Virginia Code and that the corporate notes were valid and enforceable. On the basis of this decree, the taxpayer sought leave to file a motion for further trial in the Tax Court. This was denied for lack of merit, apparently on the ground that the state court action was collusive or not really adversary. It does appear that the taxpayer's position in the state court action was that its officials believed the notes to be valid, binding obligations, but that no further payments would be made on them until the court determined and declared the rights and duties of the parties. Honestly, it hardly could have taken any other position.

### The Interest Deduction

By statute,[3] West Virginia has authorized a corporation organized under her

**2.** Mrs. Miller received $30,000 of the cash payment and a note for $195,000, the principal and interest being payable at the rate of $6,000 each six months, or until April 1, 1977. Each daughter received $10,000 in cash and a note for $102,500, the principal and interest being payable at the rate of $2,500 each six months or until April 1, 1994. The taxpayer reserved the right to anticipate these payments after April 1, 1961.

**3.** § 3051 of West Virginia Code of 1955. "Corporation May Purchase, Hold, Sell, and Transfer Its Own Stock: Not to be Voted While Held.—Every corporation organized under this chapter, or existing under the laws of this State, shall have the power to purchase, hold, sell and transfer shares of its own capital stock: Provided, that no such corporation shall use its funds or property for the purchase of its own shares of capital stock when such use would cause any impairment of the capital of the corporation: Provided further, that shares of its own capital stock belonging to the corporation shall not be voted upon, directly or indirectly: And provided further, that nothing in this section shall be construed as limiting the exercise of the rights given by the next succeeding section of this

laws, other than a banking institution, to purchase, hold and sell shares of its own capital stock. There is a proviso, however, that funds and property of the corporation may not be used to purchase its own shares if the use would impair the capital of the corporation.

The Tax Court was apparently of the opinion that the net worth of the corporation should have been reduced by the full amount of the purchase price as soon as the repurchase agreement was entered into and that the question of impairment should be determined by reference to book figures without regard to the real value of the assets. The Circuit Court for Wood County, West Virginia, on the other hand, held that the real value of the assets, which it found to be substantially more than the book figures, was crucial under the statute. The Commissioner finds the entries in the books so authoritarian that he conceded on argument that if the taxpayer had written up the value of its fixed assets on the basis of an appraisal in line with the testimony in this case and in the state court proceeding, there would have been no capital impairment. He does not question the disparity between real and book values; to him, it is the failure to have recorded the real value on the books which occasioned the asserted impairment of the capital.

We think a determination of the substantive rights of creditors, stockholders and the corporation, in the application of this statute, should not be so circumscribed by managerial decision to make or withhold particular entries on the books or by the accounting procedures followed by management, procedures which may, or may not, have been realistic or enlightened. Write ups by appraisal are frequently suspect. As a practice they are now usually frowned upon. The suggestion is startling that such a ministerial act, which alters the real situation not in the least, could enlarge corporate power to purchase its stock.

When the legislature spoke of impairment of capital, we think it had a more objective standard than a computation which is the product of years of financial history of an enterprise. If write ups by appraisal be subject to criticism in the world of corporate finance, a blind acceptance of book values as real is much more vulnerable. An overstatement of assets because of a failure to charge off obsolescent equipment should not enlarge the power of the corporation to buy its stock, nor should an understatement because of appreciation in values and the decline in the worth of money restrict it.

Corporate power to purchase its own stock has been frequently abused.[4] Done by corporations conducting faltering businesses, it has been employed to create preferences to the detriment of creditors and of the other stockholders. It was to protect and preserve the margin of safety supplied by the real value of contributed capital that such statutes were enacted. That purpose is not served if the statute is applied in terms of unrealistic values, whether higher or lower than real values. At least until the highest court of West Virginia should otherwise decide, we think for our collateral purpose the statute should be construed as prohibiting the purchase of its own stock if the use of its funds for the purpose would deplete the realizable value of its assets to a point below the total of its liabilities and capital.

What little can be found in decided cases applying similar statutes suggests that actual values, rather than book figures, are critical to the inquiry.[5] Though impressive argument may be

article. This section shall not apply to, or authorize the purchase of its shares by, any banking institution in this State."

4. See, for instance, Dodd, Purchase and Redemption by a Corporation of Its Own Shares: The Substantive Law, 89 University of Pennsylvania Law Review 697.

5. Goldberg v. Peltier, 75 R.I. 314, 66 A. 2d 107; Bolmer Bros. Inc. v. Bolmer Const. Co., Inc., Sup., 114 N.Y.S.2d 530; Hauben v. Morris, 161 Misc. 174, 291 N.Y.S. 96.

made that unrealized gain should not be available justification for dividends, similar language in statutes restricting dividend distributions has been similarly construed [6]

If we are to look to actual values in applying the statute, the spirit of the statute requires that they be conservatively determined. Opinion evidence of appreciation should be received with skepticism if insolvency ensues. Here, however, no one questions the fact that the real worth of the plant substantially exceeds its depreciated cost.[7] In subsequent years this small manufacturing enterprise has continued to prosper. Its subsequent earnings have been sufficient to maintain a good current position, meet the obligations to the Millers, pay for substantial plant additions and improvements and pay moderate dividends. Its subsequent history is one of prosperity, not of decline. No creditor has suffered loss or delay.

We think the Tax Court also misapplied the statute in declaring unenforceable an executory agreement without regard to the "use" of funds which the statute proscribes. Literally read, the statute prohibits use by a corporation of its funds to purchase its own stock if such use will impair the capital. It says nothing of executory agreements which create no rights enforceable in competition with the rights of creditors. Nor do we find anything in the purpose of the statute to protect creditors' rights which requires an extension of the literal language to executory agreements which have not, and in performance cannot, impair the preferred rights.

■■ It is now well-established that the claims of former stockholders under such executory agreements are subordinate to the claims of other creditors existing at the time of performance.[8] When a corporation purchases a portion of its outstanding stock with an agreement to pay for it at a subsequent time, it may not perform its promise if the use of its funds in performance will impair its capital. This is true though earlier performance at the time of consummation of the executory agreement would have occasioned no impairment of the capital.

■ The promise, therefore, is conditional.[9] The corporation's promise is to pay provided at the time of payment it has sufficient surplus that disbursement of the funds will occasion no impairment of capital. In effect, the statute is read into the agreement.[10] The mere existence of an executory promise to pay so conditioned that it may not be performed

---

6. Randall v. Bailey, 288 N.Y. 280, 43 N.E.2d 43, affirming 262 App.Div. 844, 29 N.Y.S.2d 512, affirming 23 N.Y.S.2d 173; Morris v. Standard Gas & Electric Co., 31 Del.Ch. 20, 63 A.2d 577.

7. For tax purposes, the corporation was required to use as its basis for its fixed assets the depreciated cost of its antecedent partnership. Starting with those figures, it showed on its balance sheet at the end of its fiscal year, 1950, a gross plant account of $543,235.46, a depreciation reserve of $345,355.59 and net book value of fixed assets of $197,879.87. It had approximately $150,000 of current assets to pay $20,000 of current liabilities. It had, according to the books, earned surplus of $132,527.53, which, added to the capital account of $200,000, gave it a net worth of $332,527.53. If, as the testimony indicates, its fixed assets had a realizable sales value of at least $1,000,000, its real net worth was more than $1,100,000.

8. See, among others, A. Leschen & Sons Rope Co. v. Brown, 4 Cir., 71 F.2d 745; Boggs v. Fleming, 4 Cir., 66 F.2d 859; Acker v. Girard Trust Co., 3 Cir., 42 F.2d 37; Coleman v. Tepel, 3 Cir., 230 F. 63; In re Fecheimer Fishel Co., 2 Cir., 212 F. 357; In re O'Gara & Maguire, D.C.N.J., 259 F. 935; In re Tichenor-Grand Co., D.C.S.D.N.Y., 203 F. 720; Richards v. Ernst Wiener Co., 207 N.Y. 59, 100 N.E. 592; Fuller v. Motor & Tire Service Co., 190 N.C. 655, 130 S.E. 545; Davies v. Montana Auto Finance Corp., 86 Mont. 500, 284 P. 267.

9. This was the express holding in Topken, Loring & Schwartz, Inc. v. Schwartz, 249 N.Y. 206, 163 N.E. 735, 66 A.L.R. 1179.

10. Friedman v. Video Television, Inc., 281 App.Div. 815, 118 N.Y.S.2d 844.

if performance will impair the capital, hardly may be said, itself, to have impaired the capital.[11]

In most of the cases which have dealt with the problem, the corporation, when it made the promise, had an apparent surplus sufficient to support it. In Christie v. Fifth Madison Corp.,[12] however, the corporation had no surplus when the promise was made. Since the promise was held to be conditioned by the statute, it was held to be a lawful obligation.

■ Whether the corporate surplus is more or less than the obligation conditionally undertaken, the application of the statute should be the same. In either case, existing creditors suffer no injury when the conditional promise is given. If creditors are prejudiced, it is performance in the use of corporate funds in violation of the statute which works the harm. Those creditors existing at the time of performance are the ones who need the protection of the statute, not those earlier creditors whose claims were unaffected by the executory promise.

■ What happened here is illustrative. When the agreement was executed in 1950, no creditor was injured. The corporation has prospered since then. With subsequent earnings, it has met its maturing obligations under this agreement, paid for plant additions and improvements and maintained a good cash position. The 1950 creditors' claims long ago were paid in full. If the corporation should suffer financial reverses, creditors of a future day may be exposed to prejudice by further performance of this agreement. For the benefit of those future creditors who may need the protection of the statute, the impact of the statute should be felt at the time of performance, to which its language is directed. In the meanwhile, when corpo-

rate use of corporate funds adversely affects no creditor, the statutory language need not be expanded to thwart the reasonable purposes of the corporation and of its present and former stockholders.

As we stated in connection with the other branch of this problem, we deal with the statute only collaterally. If the literal language of the statute is to be expanded to have the effect for which the Commissioner contends, it should be done by West Virginia's legislature or her courts. We find no justification for our interpreting the statute, for our purpose, to have so expanded and so technical an application.

The Commissioner seeks to support the holding of the Tax Court upon the additional ground that the transaction brought no new money into the corporation. He relies upon cases dealing with hybrid securities where the courts have disregarded the labels attached by the parties to securities and to distributions to the security holders. In such cases the fact that no fresh money came into the corporate treasury when the securities were issued may be of importance. Here, however, the Commissioner does not contend that the Millers are not creditors, or that the notes should be treated as preferred stock. His basic contention is that they are creditors, holding notes, the issuance of which impaired the capital. Under the circumstances, the fact that issuance of the notes brought no new money into the till is irrelevant.

### The Avoidance of Surtax upon Stockholders Through Accumulation of Earnings

■ The Tax Court upheld the imposition of the tax under § 102 of the

---

11. Perhaps the condition is more accurately expressed as being that performance should not occasion a violation of the statute. In liquidation, the claim of the promisee, deferred to the claims of all general creditors, would be preferred over the interests of the remaining stockholders. Until the claims of all other creditors are fully satisfied, however, the practical effect of the condition may be stated in the language of the statute.

12. Sup., 123 N.Y.S.2d 795.

1939 Code [13] because of the fact that an accountant suggested the purchase of the Miller stock by the corporation. It reasoned that he must have known that if the corporation had paid additional dividends to the Strattons in an amount equal to the disbursements to the Millers, the Strattons would have had larger surtax obligations. It was of the opinion the purchase of the Miller stock served no corporate purpose, and that the Strattons must have learned of the tax considerations from their accountant and must have acted as they did for the purpose of avoiding additional surtax on their personal income.

There was no finding that the Millers, who suggested the corporate purchase to the Strattons, would have been willing to accept the personal obligations of the Strattons or that the Strattons would have been willing to obligate themselves and their estates to make payments extending over a period of 44 years. There was no finding that in any year accumulated earnings were unreasonable or in excess of the needs of the business.[14] There was only the opinion that these disbursements served no legitimate corporate purpose and were arranged by the Strattons with a purpose of avoidance of surtaxes.

We disagree with the premise of the Tax Court that these disbursements served no corporate purpose.

The problem which confronted the widow and daughters of Ben Miller and the Strattons is one that frequently arises upon the death of one co-venturer in a relatively small business enterprise. Many of those enterprises are worth substantially more to those who are able and anxious to manage them, deriving livelihoods from salaries, than to passive investors who must look only to prospective dividends for a return upon their investment. The Miller stock clearly was worth much less as a continuing investment to Mrs. Miller than it would have been worth to Ben Miller had he survived and remained active in the management of the business. It was natural that she should demand that the business be sold or liquidated, and it would have been essentially unfair to have left her and her daughters indefinitely in a position in which they could expect relatively small and uncertain income from what everyone regarded, with reason, as a valuable property.

This sort of situation leads to demands for dividends out of consideration of the stockholders' personal financial need, perhaps without appropriate regard for the need of the corporation to make capital expenditures in order to maintain a competitive position. On the other hand, those stockholders active in the management of the business deriving salaries from it may be able to afford indulgence

---

13. "§ 102. Surtax on corporations improperly accumulating surplus

"(a) Imposition of tax. There shall be levied, collected, and paid for each taxable year (in addition to other taxes imposed by this chapter) upon the net income of every corporation (other than a personal holding company as defined in section 501 or a foreign personal holding company as defined in Supplement P) if such corporation, however created or organized, is formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders or the shareholders of any other corporation, through the medium of permitting earnings or profits to accumulate instead of being divided or distributed, a surtax equal to the sum of the following:

"27½ per centum of the amount of the undistributed section 102 net income not in excess of $100,000, plus

"38½ per centum of the undistributed section 102 net income in excess of $100,000.

\* \* \* \* \*

"(c) Evidence determinative of purpose. The fact that the earnings or profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid surtax upon shareholders unless the corporation by the clear preponderance of the evidence shall prove to the contrary. \* \* \*"

14. See Young Motor Company Inc. v. Commissioner, 1 Cir., 281 F.2d 488.

of an ambition to enlarge future earnings through still larger current capital expenditures, an indulgence which other stockholders may ill afford.

When the stockholders have such conflicting interests, the corporation and its future are necessarily affected. When the situation results in demands that the business be sold or liquidated, as it did here, the impact of the conflict upon the corporation is direct and immediate. That it is of concern to employees is illustrated by the brief *amicus curiae* of United Steelworkers, the bargaining agent of the taxpayer's employees, filed in support of the taxpayer's position. The resolution of such a conflict, so that the need of the corporation may govern managerial decision, is plainly a corporate purpose.

Many business men now anticipate such problems and provide solutions through agreements, and implementing devices, to take out the estate of a co-venturer, who dies, on a basis designed to be fair to the estate, to the enterprise and to the surviving co-venturers. It has been held that corporate disbursements to pay insurance premiums to provide a fund with which to purchase stock from the estate of the person whose life is insured do serve a corporate, business purpose.[15] If disbursements to create a fund with which to purchase stock serve a corporate purpose, surely the disbursement of the created fund in purchasing the stock serves the same purpose.

For a long time there was controversy over the tax consequence to shareholders when a corporation made disproportionate distributions in partial redemption of its stock. Congress finally acted in this field.[16] Among other things, it specifically provided that a partial redemption of the shares held by an estate would be treated as a sale, not as a distribution of earnings, if the amount of the distribution did not exceed the estate's liabilities for estate and inheritance taxes, interest and funeral and administration expenses.[17] When Congress specifically provided favorable tax treatment for such transactions and sought to encourage them to facilitate the administration of estates, it hardly could have intended to penalize the corporation for doing the favored act.

We need not say that under no circumstances may a stock purchase be relevant to a question arising under § 102 of the 1939 Code. When it is done out of cash accumulations which reasonably may be thought excessive, such a purchase, along with other factors, may be considered appropriately in arriving at ultimate findings.[18] The fact of redemption, of itself, however, furnishes no basis for imposition of the § 102 tax. In the circumstances in which they were made, the disbursements in payment for the stock, themselves, do not support a finding that they were withdrawn from excess funds accumulated from earnings beyond reasonable corporate need. Nor is the situation altered by the fact that the Strattons may have been aware that travel along another route would have cost something more in taxes. If they had a choice of routes, they were not required to choose the one which would be most costly to them in taxes.

Reversed.

15. Emeloid Co. v. Commissioner, 3 Cir., 189 F.2d 230; see, also, Prunier v. Commissioner, 1 Cir., 248 F.2d 818; Sanders v. Fox, 10 Cir., 253 F.2d 855.

16. 26 U.S.C.A. § 302 et seq.

17. 26 U.S.C.A. § 303.

18. See Pelton Steel Casting Co. v. Commissioner, 7 Cir., 251 F.2d 278.