### ACKER v. GIRARD TRUST CO. et al.
No. 4335.

Circuit Court of Appeals, Third Circuit.
June 30, 1930.

Thomas F. Gain, of Philadelphia, Pa., H. C. Reynolds, H. M. Streeter, John P.

Kelly, and Reese H. Harris, all of Scranton, Pa., and Francis Shunk Brown, of Philadelphia, Pa., for appellant.

Thomas Reath Jr., and Dickson, Beitler & McCouch, all of Philadelphia, Pa., for appellee Buchanan.

Charles Myers and Barnes Biddle & Myers, all of Philadelphia, Pa., for appellee Girard Trust Co.

Before BUFFINGTON and DAVIS, Circuit Judges, and AVIS, District Judge.

BUFFINGTON, Circuit Judge.

On October 3, 1927, the court below, on a bill filed that day, duly appointed receivers for the South Penn Collieries Company, an insolvent corporation of the state of Delaware.

On the same day the Girard Trust Company, trustee under a second mortgage of said company, was, on its petition, allowed to intervene.

On October 27, 1927, Franklin Spencer Edmonds was appointed a master "to take evidence and report the same with his findings thereon, upon the following matters; * * * (h) the amounts of the claims of creditors of the defendant, South Penn Collieries Company, other than the holders of first and second mortgage bonds."

On January 23, 1928, Warren T. Acker, the present appellant, filed a petition which so far as here pertinent represented that he owned all the stock of the Von Storch Collieries Company, which had valuable coal property in fee, and that he had sold to the South Penn Collieries Company all such capital stock, receiving in pay therefor two millions in cash and certain capital stock of the buying company. He further stated that part of the consideration was that the latter agreed to employ him as manager for five years and "that if at any time the company should desire to retire him as manager, it should pay to him the sum of $500,000, and your petitioner was then to transfer to the company his said five per cent. of the common stock," to wit, $500,000 of stock. He further averred that his contract with the company "was a closed contract as to prior liens which might dilute or jeopardize the value of your petitioner's stock representing the balance of the purchase price for his said valuable properties." He further alleged that the buying company had later by "repeated and continued interferences and violations of the said contract and the usurpation of his rights, and powers was such as

to deprive him of all power and authority as general manager and, in the language of the contract, to 'retire' him as general manager." He further alleged that the buying company had, in violation of its contract with petitioner, given to the Girard Trust Company the second mortgage upon its property for $2,000,000, which said trustee was now seeking to foreclose, which foreclosure "would result in wiping out your petitioner's contract and the payment to him of $500,000, the balance of the purchase price for his said coal property and which is owing to him because of violations of his contract as aforesaid."

As here pertinent the petition prayed:

"7. That the Special Master appointed by the Court be authorized and directed to hear and determine the various rights and questions involved in the claim of Warren T. Acker against the South Penn Collieries Company arising from or affecting his contracts with said company and any violations thereof, and also any acts or things showing any conspiracy or fraudulent or unlawful confederacy or action on the part of directors or officers of said company affecting his rights under said contracts, or to bring about the appointment of a receiver, or the foreclosure of the second mortgage on the property of said company, and also to determine whether said mortgage and bonds thereunder have priority, and to what extent, if any, over the claim of the said Warren T. Acker."

On February 7, 1928, the court referred Acker's claim to the master already appointed and directed him—

"To hear evidence and report his findings and conclusions to the Court upon the following matters in addition to the matters heretofore referred to him:

"1. What amount, if any, is due and owing by the South Penn Collieries Company to Warren T. Acker under or by virtue of his contracts with said company, and the lien of priority, if any, to which such claim may be entitled.

"2. All relevant matters affecting the validity, lien and priority of the mortgage of $2,000,000 made by the South Penn Collieries Company to the Girard Trust Company, trustee, under date of January 1, 1926."

Much testimony was taken, and on June 13, 1929, the master filed his report; the pertinent findings of fact and conclusions of law therein are later stated.

To such report Acker filed exceptions which were heard by the court below, and on

August 21, 1929, were dismissed and the report confirmed. Thereupon this appeal was taken by him.

Without referring to the many questions decided by the master, we limit ourselves to stating and discussing the two questions involved which are stated in appellant's brief, namely:

"Whether the second mortgage constituted a violation of the contract between the defendant company and the intervening creditor, and whether it may be enforced as a valid lien against the property of the Company in priority to the amount due such creditor.

"Whether the amount found by the Court to be owing to the intervening creditor must be postponed in payment until after the payment of all other creditors."

Referring first to the question of the validity of the Girard Trust Company mortgage and its priority over general creditors, we note the master held: "That the evidence clearly establishes the fact that the second mortgage was created, and that the bonds thereunder were issued, in entire good faith. The circumstances attending the creation of this mortgage and the issuance of the bonds have been fully set forth above. The defendant company was badly in need of additional capital. Its financial condition was such that it could not procure loans from banks, and the creation of the second mortgage and the issuance of bonds thereunder was certainly the most feasible, if not the only way by which the defendant company could have procured the needed capital." A study of the proofs satisfies us the finding of the master in this regard involved no error.

He further held the creation of such mortgage was not a violation of the buying company's contract with Acker, and we agree with the court below that no error was committed by the master in decreeing priority of said mortgage over general creditors.

We may here state that as to Acker's allegation that he was wrongfully retired by the buying company, the master found as follows:

"On this question, the Special Master is of the opinion that the conduct of the defendant's officers and representatives during the period from November 6, 1924 to February 5, 1926, culminating in the removal of Acker's offices from the collieries to the Bowman Building in Scranton, some two miles away, was such a usurpation and diminution of Acker's duties, authority and responsibility, as to constitute a retirement of Acker as general manager of the Von Storch and Legitts Creek properties as of February 5, 1926, within the meaning of the third section of the contract of November 6, 1924."

In the event of such retirement, the third section of the contract provided,

"And if the Vendee should retire the said Warren T. Acker, as General Manager of the combined Companies, within the period of five years, all of said common stock shall be assigned to the Vendee or its nominee, whereupon the said Five Hundred Thousand Dollars ($500,000) shall be paid to the said Warren T. Acker by the Vendee for all of the stock, to wit, one-twentieth (1-20th) of the whole stock, and thereupon assignment thereof as hereinabove provided shall be made to the Vendee or its nominee."

On this branch of the case the master reported as follows:

"As has been pointed out, it was agreed in the third section of the contract of November 6, 1924, that the defendant company would employ Acker, who agreed to serve, as general manager of the Von Storch and Legitts Creek properties for a period of five years. It was further provided that if at any time during this period, the defendant should desire to retire Acker as such general manager, it should pay to Acker, at his election, the sum of $500,000, for his shares of stock in the defendant company, whereupon Acker was to assign said shares of stock to the defendant or its nominee.

"Clearly this provision of the contract did not require the defendant company to retain Acker in its employment for the period of five years. On the contrary, its right to retire Acker was conceded, subject only to the provision that if it did retire him within the five year period, then if Acker so elected, the defendant company was required to pay him $500,000 for his stock in the defendant company.

"The Special Master is therefore of the opinion that the defendant company would have been guilty of no breach of contract if it had definitely and directly retired Acker by notifying him that his services would be no longer required. If the defendant company had done this, Acker's only remedy would have been to insist, if he so elected, that the defendant company pay him $500,000 for his stock. Since his retirement would not be a breach of contract, Acker would have no claim for damages on account thereof.

"Nor has Acker any greater rights because of the fact that he was retired indirectly, as a result of the unfair conduct of the defendant's officers and representatives. Legally, this conduct, however reprehensible, was just the equivalent of an open, straightforward, definite retirement, and gave Acker just the same rights. The Special Master is of the opinion, therefore, that Acker's only remedy for his retirement, however accomplished, was his right to insist that the defendant company pay him $500,000, for his stock."

It remains to consider the remaining question involved, namely, whether, as provided in the decree below, Acker's claim "is to be deferred to the prior payment of the claims of all other creditors of the defendant company.".

We are of opinion no error was committed in such decree. In reality the relief Acker seeks is to compel the buying company to buy its own stock at the expense of its creditors. The company has no surplus, and therefore, as a Delaware corporation, its powers are fixed by the laws of that state (Rev. Code Del. 1915, § 1933), which provide that:

"Every corporation organized under this Chapter shall have the power to purchase, hold, sell and transfer shares of its own capital stock: Provided that no such corporation shall use its funds or property for the purchase of its own shares of capital stock when such use would cause any impairment of the capital of the corporation."

Construing such statute, the Court of Chancery of Delaware held, in Re International Radiator Company, 10 Del. Ch. 358, 92 A. 255, such stock purchases could only be made out of a corporation's surplus.

Moreover, this court, in West Penn Chemical & Manufacturing Company v. Prentice, 236 F. 891, 894, said:

"We think it our duty to follow this decision upon the construction and effect of the Delaware statute, and we find it a controlling authority in the present case."

Acker's contract for exchange being unenforceable because he could not withdraw assets from the treasury of the company, it logically follows he cannot, by indirection and making a claim for damages for the breach of a nonenforceable contract, withdraw assets in the hands of the court by presenting his contract rights in the guise of damages.

Finding no error in the case, the decree below is affirmed.