W. Clarke CUNNINGHAM, Trustee in Bankruptcy for Balentine Packing Company, a Corporation, Plaintiff,

v.

Benjamin D. JAFFE, Jacob Schwartz, Joseph H. Jaffe and Melvin Schwartz, Defendants.

Civ. A. No. 4378.

United States District Court
D. South Carolina,
Greenville Division.

March 2, 1966.

C. Thomas Wyche, of Wyche, Burgess, Freeman & Parham, Greenville, S. C., for plaintiff.

William L. Pope, of Robinson, McFadden & Moore, Columbia, S. C., for defendants.

HEMPHILL, District Judge.

Plaintiff and defendants have appealed from the Order of Special Referee Thomas H. Pope, filed January 12, 1966, at the same time each seeks partial affirmance. The Referee's authority commenced April 22, 1965, upon Order of this Court directing full exploration of certain issues [1]; later, after granting [2]

---

1. The Order reads, in part:

The petitioners in B 1999 are the defendants in CA 4378 and the controversy arises out of a transaction had between them and the debtor in B 1999 which is also a party plaintiff in CA 4378. This transaction was set aside by the Order of the Referee in Bankruptcy and it is the petitioners position that they were not given a hearing on the merits, that

the Referee in Bankruptcy lacked jurisdiction over the subject matter because it was held adversely by them and that they were secured creditors beyond the reach of the Referee in a Chapter XI proceeding.

The debtor corporation has been adjudged a bankrupt and a trustee appoint-

2. See note 2 on p. 145.

trustees' request for amendment of the complaint, the issues joined thereupon were explored by the Referee.[3] In the proceeding before the Special Referee in Bankruptcy (B 1999) he had issued a Rule to Show Cause why the attached stock redemption should not be set aside and defendants required to account for moneys withdrawn from the corporation by defendants as officers and directors. Referee Pope, in his excellent treatment found and advised the Court upon all such issues.

The report of Special Referee Thomas H. Pope in effect holds that the redemption of the defendants' stock was void by reason of impairment of capital and that the transaction was never authorized by proper corporate action, formal or otherwise. Further, that the Trustee in Bankruptcy is estopped to question the salaries paid by the corporation to the defendants and that the Trustee in Bankruptcy had the burden of proof and failed to prove that the expenses were excessive or for improper purposes.

The Trustee in Bankruptcy contends that the corporation, as a matter of law, and particularly the Trustee as representative of the creditors, is not estopped to recover any salaries withdrawn by the defendants which were unearned or excessive. He further contends that the burden of proof with respect to expense moneys withdrawn by officers and directors is not upon the Trustee in Bankruptcy but, rather upon the defendants because of the fiduciary position which they occupied at the time that they paid themselves these moneys. The Trustee frankly admits that if the burden of proof as to wrongful withdrawal of expense moneys is upon him, his contention in this respect must fail; on the other hand, if the burden of proof is upon the defendants by reason of their fiduciary relationship, it is contended that they have not accounted for such withdrawals.

The substance of the defendants' appeal is that the corporation was not insolvent in the bankruptcy sense, i. e., its liabilities did not exceed its assets and that, therefore, its capital was not impaired at the time of the stock redemption transaction. They further contend that the existence of purported minutes of a stockholders' and directors' meeting must be taken by the Court as conclusive evidence that such a meeting did in fact take place. It is also contended by the defendants that notwithstanding the lack of any corporate action, the Trustee in Bankruptcy is estopped to question the validity of the transaction.

The bankrupt had filed a Chapter 11 Petition on June 20, 1963, and was adjudicated a bankrupt on October 10, 1963.

### THE STOCK REDEMPTION

The bankrupt corporation was organized on July 26, 1962, with $50,000 paid in capital, of which amount $43,800 was paid by the defendants. This corporation purchased for the sum of $500,000 the assets of a South Carolina corporation having substantially the same name. $50,000 cash was paid down and the remaining $450,000 of the purchase price was represented by loans over the assets of the corporation exclusive of the machinery and equipment. Business commenced on or about September 1, 1962. The corporation steadily lost money. In February and March, 1963, the company

---

ed; it is the trustee's position that the order is proper and should be sustained as a proper exercise of the Referee's jurisdiction in a summary proceeding.

While preserving these positions on the record, the Court finds that this matter should be held in abeyance and the status quo maintained until a plenary hearing can be had in CA 4378. The parties have agreed before the Court to the substitution of the trustee for the corporation as a party plaintiff in that action and the referral of that action to Thomas H. Pope, Esquire of Newberry, S. C., for a prompt hearing on the merits and that his report shall come back to the Court for a final disposition of the entire controversy subject, of course, to the rights of the parties to appeal as they may be advised.

2. D. C., 37 F.R.D. 431.

3. See report attached as appendix hereto.

was unable to meet its obligations as they matured. By March 2, 1963, the corporation had sustained an operating loss exclusive of depreciation of $76,-928.47; including the depreciation the loss as of the date was approximately $124,000. Thus, as of March 2, 1963, the operating loss had exhausted the capital of the company. At the end of March, the operating loss exclusive of depreciation was $124,000. On March 9, 1963, the defendants B. D. Jaffe and Jacob Schwartz entered into an agreement with the bankrupt corporation to sell all of their stock back to the bankrupt (this was prior to bankruptcy) for the sum of $100,000; this was more than double what they had paid for it. Under this agreement, the sum of $21,500 was paid to them in several installments by the end of the next month, April, 1963.

 It is recognized by defendants that if the capital of the corporation was impaired at the time this transaction was entered into, it would be a void transaction. In Jarroll Coal Co. v. Lewis, 210 F.2d 578, 47 A.L.R.2d 753 (4th Cir. 1945), the Court faced a factual situation almost identical to this case and under a West Virginia statute which was, as stated by the opinion, taken from the general corporation law of the State of Delaware. In that case, the bankrupt company, Jarroll Coal Company entered into a contract whereby it purchased all of the stock from Mr. E. L. Jarroll, Sr., paying him $4,000 in cash and giving him a note for $20,000. At the time of the execution of the note, the

assets of the company exceeded the liabilities by less than $15,000. The Court held that the transaction was void stating:

> Whether we look to the execution of the note or of the deed of trust securing it, we think that the attempt to secure an indebtedness incurred in the purchase of the corporation's stock, an indebtedness which not merely impaired its capital but rendered it insolvent, was necessarily void because violative of section 3051 of the West Virginia Code and that it constituted a fraud upon subsequent as well as existing creditors which gives them standing in court to attack the transaction. 210 F.2d at 580.

From the standpoint of bankrupt's corporate books, it is obvious that the capital was impaired at the time of the stock purchase in March, 1963; not only was the capital impaired, it was totally depleted and was in a deficit position.

The defendants contend, however, that the books of the company did not reflect the true value of the assets, and, in actuality, the value of the assets did exceed the liabilities of the company in March of 1963. This argument is based, in part, on a so-called appraisal prepared by Starr Parker Associates in November of 1962. This appraisal on its face purports only to be a statement of what the replacement cost of the existing assets would have been. In fact, the appraiser himself, Mr. Starr Parker, a witness for the defendants admitted [4] on

---

4. (Transcript of November 3, 1965, pp. 123–125)

"Q I am talking about this plant. In all candor, don't you think the figure of $1,387,000 is more than a willing buyer would pay to a willing seller?

"A All I am qualified to say is that the appraisal, based on replacement cost, is in my opinion accurate.

"Q But you don't feel qualified to state what, shall we say, the true value is on the market?

"A I wasn't employed to determine market value.

"Q Do you feel qualified to express an opinion?

"A No, sir, I would prefer not to.

"Q I appreciate your reluctance to do that, but do you feel qualified to express an opinion on that?

"A No, sir."

\* \* \* \* \*

"Q May I interrupt you, you say you are not qualified to express an opinion about fair market value?

"A That is correct.

"Q Obviously you didn't purport to express an opinion in this appraisal?

"A That is correct.

"Q The figures you've got in the appraisal do not purport to state fair market value of the plant and equipment?

"A That is right."

cross examination that he did not feel qualified to express an opinion on the market value of the assets and that the figures in the appraisal did not purport to state a fair market value of the plant and equipment.

The accountant for the company was careful to point out on the company's statement that the appraisal was one based on replacement values. These figures are of slight probative value. This case is representative of scores reaching the same conclusion.

Defendants further contend that the value of the assets as carried on the books of the South Carolina corporation (from which the assets were purchased) are representative of fair market value and considering those values, the assets of the bankrupt exceeded its liabilities. While this was some evidence to be considered by the Special Referee, it was not conclusive. In fact, the record shows that the book value of assets of the South Carolina corporation may have been not truly representative of their true value inasmuch as some of the land and buildings was acquired by the South Carolina corporation from the estate of the owner; the corporation was owned by the family and members of the family who were the heirs of the estate.[5] In other words, these assets were not acquired in an arms-length transaction and are not necessarily reflective of the true value of such assets. Furthermore, book value of assets does not necessarily reflect obsolescence which could have occurred over a period of time at a considerably higher rate than depreciation.

The Court is of the opinion that the findings of fact by the Special Referee as to impairment of capital are amply supported by the evidence and should be affirmed. On March 9, 1963, the company was insolvent in the bankruptcy sense and also its capital had been impaired at that time. This renders the transaction between the defendants and the bankrupt corporation void.

The Special Referee further found that there was no meeting of the directors or stockholders authorizing the purported contract and that such contract was never ratified by the stockholders or the directors. Again, the legal effects of lack of such corporate action is not in dispute. It is uniformly held that absence of proper corporate action such as this renders the transaction void. The defendants contend, however, that the evidence shows that a valid meeting was held in Greenville. It is difficult for the Court to understand how such a contention could be seriously made in view of the uncontroverted testimony of all of the witnesses. The existence of a piece of paper purporting to be minutes of a stockholders' or directors' meeting certainly is not conclusive of the fact that such meeting was actually held. It is clear in this case that, not only was such meeting not held but that the Chairman of the Board of Directors, Kenneth Cass, long-time Mayor of Greenville, South Carolina, and the President of the Company and member of the Board, Varnum Wells had no knowledge that the purchase agreement had been entered into until after it had been consummated and the first payment made. Under these circumstances, there is no basis for contending that the corporation is estopped to question such flagrant disregard of the elemental requirements for corporate action, particularly when those benefiting from such disregard are themselves officers and

---

5. (Transcript of November 3, 1965, pp. 57–58)

"Q This was carried on the South Carolina corporation books what it paid the Balentine estate for it in 1949?

"A Yes, less depreciation as it continued along.

"Q That is an open entry, what it paid the estate?

"A Right.

"Q That transaction, was that an interfamily transaction whereby the family corporation acquired the building from the Balentine estate?

"A Right.

"Q Would you classify that as an arm's length transaction or not?

"A It was between the corporation owned by the family and the members of the family who were heirs of the estate."

directors. The Special Referee's findings of fact in this regard are amply supported by the evidence and should be confirmed. This conclusion renders the stock redemption void for lack of proper corporate action.

In view of the findings and conclusions hereinabove, supporting the Special Referee, this Court need not consider whether the transaction(s) were fraudulent conveyances.

Defendants take exception to Finding of Fact No. 4 of the Special Referee on grounds that no chattel mortgage or any personalty was given as security for plaintiff's loan of $225,000.00 from Mills Factors, the collateral being assignment of inventory and accounts receivable. The exception raises no issue material to the finding of this Court.

## SALARIES, EXPENSES AND ATTORNEY'S FEES TO DIRECTORS AND OFFICERS OF THE CORPORATION

The amended complaint alleges that the defendants are responsible for $45,-753.35 in salaries paid to the officers and directors of this corporation; however, a question propounded by interrogatory to the Trustee in Bankruptcy revealed that the corporation had only paid a total of $34,625.00 to all of the officers and directors as salaries.

The salaries of the officers and directors of this corporation were established at a joint meeting of the stockholders and directors held on October 1, 1962, at Greenville, the minutes of which are in evidence. As of said date, all the stock of this corporation, except 6,000 shares held by Michael Rothberg as compensation for services rendered as broker, were held by Penzell, Jaffe, and Schwartz. In addition to 200,000 shares of stock out of a possible 206,000 shares being represented at this meeting, all of the

directors of the corporation were present and participated in fixing the salaries. There was no evidence before the Special Referee that any officer or director received any compensation other than that authorized at this meeting. The salaries were set out by the corporation and it cannot now contend that they were excessive. The action was eight months before the petition for bankruptcy, twelve months before the corporation was adjudged bankrupt.

To hold that the salaries, and attorney fees should be disallowed (in this court) and judgment rendered therefor would, in effect be a commitment of this forum that the facts show the amounts were "given away".[6]

■ Plaintiff pursues in place of the corporation to recover the salaries and attorney fees, does not here employ the statutory remedy available to a Trustee in Bankruptcy under the Bankruptcy Act,[7] for the benefit of creditors. When a corporate officer's use of corporate funds for his own purposes has been ratified by all the shareholders, corporation loses its right of action for conversion, and the trustee has no right of action against such officer.[8]

Defendants deny that there is any evidence that the salaries paid by the corporation were excessive, but even if they were, the corporation and the other stockholders are estopped from complaining by reason of their participation in fixing the salaries. As stated in 19 Am.Jur.2d, Corporations § 1425:

> Neither the corporation nor its stockholders in a derivative suit may complain that the salary paid its president was excessive where such salary was authorized by vote of the stockholders * * * See also: Annotation 16 A.L.R.2d 467; 5 Fletcher on Corporations § 2177.

6. See McQuillen v. National Cash Register Co., D.C., 27 F.Supp. 639; 4 Cir., 112 F.2d 877, cert. den., 311 U.S. 695, 61 S.Ct. 140, 85 L.Ed. 450.

7. See Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281, holding the fidu-

ciary obligation of a director or dominant stockholder was held enforceable by a trustee in bankruptcy of the corporation.

8. Field v. Lew (E.D.N.Y.) 184 F.Supp. 23, 26.

██ The substituted plaintiff steps into the shoes of the corporation and since the corporation is estopped from attacking the salaries paid by it, the substituted plaintiff is likewise estopped. In Field v. Lew the Court held:

However, the general rule of liability does not apply when the officer's acts have been ratified by all the shareholders of the corporation. In that case, the unauthorized acts of the individual become the authorized acts of the corporation, the corporation loses its right of action against the officer, and the corporation, having no right, the trustee in bankruptcy also has no right. See 5 Remington on Bankruptcy § 2238.

██ Estoppel prevents those who participated in fixing the salaries from claiming excessiveness, and likewise no subsequent stockholders, if there were any, could complain because he would have become a stockholder with notice of the established salary schedule. Hurt v. Cotton States Fertilizer Co., (5th Cir.) 159 F.2d 52.

The record in this case is void of any evidence indicating that the salaries paid by this corporation to any of its officers or directors were actually excessive. No attempt was made to show excessiveness except in regards to the salaries of Jaffe and Schwartz and then only by insinuation that they spent too little time in Greenville.

In their testimony at the hearing, Jaffe and Schwartz summarized briefly the nature of the services they performed for the corporation. No additional comment is necessary since none of their testimony was contradicted. Most of the matters dealing with policy were discussed and handled through correspondence and telephone conversations between Jaffe, Schwartz and Penzell. These three, with Wells, constituted a duly appointed executive committee to handle all matters between board meetings. The corporation paid a portion of the rent on an office in Miami where Jaffe spent considerable time on the corporation's business, sometimes with Penzell. In addition to this, trips were made, not always to Greenville, in attempts to obtain new business for the corporation.

Jaffe, in particular, approved to be a man of substantial business ability and experience. This was a corporation doing a gross business of approximately $5,000,000.00 a year. This Court will not substitute its opinion for that of the directors and stockholders of the corporation in determining what were reasonable salaries under the circumstances. See 19 Am.Jur.2d, Corporations, § 1423.

Plaintiff contends that Schwartz received the sum of $9,883.67 as excessive attorney fees. There is no evidence that he ever received any amount as designated legal fees. The records reveal that Schwartz received $500.00 per month from the corporation, representing his salary as an officer and as a director. Again, this was a matter for the corporation under the circumstances.

Plaintiff contends that Melvin Schwartz and Joseph Jaffe, as "students", received a part of the moneys. The record is sufficient to show that the funds to them were funds of others diverted to them.

The substituted plaintiff would have defendants reimburse the corporation for sums of money paid by it to officers and directors for expenses. This Court finds no basis in the record to grant such relief.

The Report of Special Referee Thomas H. Pope is confirmed. The recommendations therein contained are made the order of this Court.

Counsel for plaintiff will submit appropriate order for judgment in accordance herewith.

The Clerk shall tax costs, including a fee of One Thousand Dollars for the Special Referee.

And it is so ordered.

### REPORT OF SPECIAL REFEREE POPE

Pursuant to the Order of Reference designating the undersigned as Special

Referee, dated April 22, 1965, directed to me in the above entitled cause, I held references at Newberry, South Carolina, on November 3 and 4, 1965, and on December 30, 1965. Exhaustive and helpful Briefs were filed by counsel and oral arguments were heard. I have taken the testimony and beg leave herein to set forth my Report, together with the testimony and exhibits.

This action was commenced in the Court of Common Pleas for Greenville County, South Carolina, by J. Kenneth Cass and Balentine Packing Company, Inc., Plaintiffs against the above named defendants. In their Amended Complaint of June 13, 1963, plaintiffs sought cancellation of certain notes and mortgages given by the corporation to the defendants. The defendants removed the action to this Court and served their Answer, dated July 22, 1963, in which they interposed a general denial.

Thereafter, the Trustee in Bankruptcy gave Notice of Motion to be permitted to file an Amended Complaint, substituting the Trustee as plaintiff and setting forth additional claims for relief against the defendants. Pending decision on this Motion, the Court referred the matter to me. On June 8, 1965, Judge Hemphill passed his Order granting the present plaintiff's Motion to be permitted to file an Amended Complaint, setting forth additional claims for relief.

The Amended Complaint of the Trustee in Bankruptcy seeks (1) a rescission of the sale of certain stock of the defendants to the corporation on March 14, 1963, (2) recovery of payments made to the defendant by the corporation in the amount of $21,500, (3) cancellation of the notes and chattel mortgages, (4) recovery of excessive salaries paid the defendants as officers and directors, (5) recovery of excessive expenses for which the corporation reimbursed the defendants, and (6) recovery of excessive legal fees paid to the defendant Jacob Schwartz.

By their Amended Answer of June 30, 1965, defendants deny all of the allegations of the Complaint and ask that the mortgage held by the defendants be foreclosed and that defendants have judgment against the plaintiff in the amount of $78,500, plus interest.

### Findings of Fact

I make the following Findings of Fact:

1. This Court has jurisdiction of the parties and of the subject matter of this action.

2. For sometime prior to July 1962, the stockholders and directors of Balentine Packing Company, Inc., a family-owned South Carolina corporation located at Greenville, had endeavored to sell the assets of that company. On July 26, 1962, Balentine Packing Company, Inc. entered into a contract of sale with Benjamin D. Jaffee, one of the defendants in this action, and H. Roy Penzell, looking toward the purchase of all of the assets of the South Carolina corporation and the assumption of all liabilities, except a balance due on a note and real estate mortgage held by South Carolina National Bank.

The consideration to be paid was the sum of $500,000.

3. On July 26, 1962, Balentine Packing Corporation was issued its charter by the State of Delaware; such corporation had an authorized capital of 1,000,-000 shares of common stock at ten cents per share. The contract to purchase the assets of Balentine Packing Company, Inc., the South Carolina corporation, was assigned to the Delaware corporation, which, on August 31, 1962, consummated the purchase from the South Carolina corporation for $500,-000.00.

4. Of the $500,000 paid by the Delaware corporation, the sum of $225,000 was represented by a mortgage on the real estate of the corporation given to the South Carolina corporation. The sum of $225,000 was borrowed from Mills Factors, Inc. which was given a chattel mortgage on the inventory, accounts receivable and personalty. The sum of $50,000 was paid in cash, being derived from payments made to the Delaware corporation by the defendant Jacob

Schwartz of $7500, by the defendant Benjamin D. Jaffe of $36,300 and by H. Roy Penzell of $6200.

5. Stock was originally issued in the Delaware corporation as follows: 80,000 shares to H. Roy Penzell; 80,000 shares to Benjamin D. Jaffe; 20,000 shares to Jacob Schwartz on August 27, 1962; and 6000 shares to Michael M. Rothberg on August 31, 1962. Twenty thousand additional shares of stock were issued to H. Roy Penzell on October 2, 1962.

6. At the meeting of incorporators held on July 26, 1962, the following persons were elected directors of the Delaware corporation: Kenneth Cass, Varnum M. Wells, H. Roy Penzell, Jacob Schwartz, Benjamin D. Jaffe, Erna Gwillim, Lorraine Penzell, Michael M. Rothberg, Paul Singletary and Marshall Balentine. On August 31, 1962, Erna Gwillim, Lorraine Penzell, Paul Singletary, Michael M. Rothberg and J. M. Balentine declined to serve as directors. At a meeting of stockholders and directors held in Greenville on October 1, 1962, the resignations of the aforementioned persons from the Board of Directors were accepted and James P. Penzell and Melvyn Schwartz were elected directors. At this meeting, Mr. Varnum M. Wells was named as President; H. Roy Penzell as Executive Vice President, J. H. Jaffe as Vice President, Jacob Schwartz as Secretary, Benjamin D. Jaffe as Treasurer and Kenneth Cass as Chairman of the Board. The following salaries were adopted: Kenneth Cass to be paid $250 per month and given 80 shares of stock per month up to a total of 1000 shares; Varnum M. Wells to be paid $1500 per month and given 195 shares of stock monthly, with a limit of 10,000 shares; H. Roy Penzell to be paid $1500 per month and given 150 shares of stock per month; B. D. Jaffe to be paid $1300 per month and given 100 shares of stock per month; Jacob Schwartz to be paid $500 per month and given 50 shares of stock per month; J. H. Jaffe to be paid $200 per month and given 10 shares of stock per month. As directors, James P. Penzell, Melvyn Schwartz and Joseph H. Jaffe were to be paid $100 each per month and each given 10 shares of stock per month.

An Executive Committee composed of Varnum M. Wells, H. Roy Penzell, B. D. Jaffe and Jacob Schwartz was formed and given full power to act between meetings of the Board.

From the organization of the Delaware corporation until March 1, 1963, stock was issued to the various officers and directors of the corporation in accordance with the foregoing schedule so that as of the latter date, stock was owned as follows:

| | |
|---|---|
| H. Roy Penzell | 100,900 shares |
| Benjamin D. Jaffe | 80,600 shares |
| Jacob Schwartz | 20,250 shares |
| Michael M. Rothberg | 6,000 shares |
| Varnum M. Wells | 1,170 shares |
| Kenneth Cass | 480 shares |
| James P. Penzell | 60 shares |
| Joseph H. Jaffe | 120 shares |
| Melvyn Schwartz | 50 shares |

7. The company lost money from the time of its organization until March 1963. On August 31, 1962, when the assets of the South Carolina corporation were acquired, the outstanding checks amounting to $133,535.05 exceeded the cash on hand which was $69,276.50. An audit was made on December 1, 1962, at which time the corporation had lost $26,652.69 without any deduction for depreciation. On March 2, 1963, the accumulated loss was $76,928.47 without deducting depreciation and at the end of March the loss without depreciation was approximately $124,000. As of March 2, 1963, the operating loss had exhausted capital and surplus.

8. In October 1962, the firm of Starr Parker Associates was employed to appraise the buildings, equipment and fixtures of the company and to make recommendations for improving the operations of the Delaware corporation. This firm estimated the replacement cost of the buildings and equipment as $1,387,000. Messrs. Penzell and Jaffe instructed the company's auditor, James F. Burgess, to reflect on his audit of December 1, 1962,

the reported replacement cost of the company's properties. He did so and commented upon the reappraisal in a footnote on his balance sheet.

9. On March 9, 1963, the defendants B. D. Jaffe and Jacob Schwartz entered into an agreement to sell all of their stock in the Delaware corporation to the corporation for the sum of $100,000. This agreement was made solely between B. J. Jaffe and Jacob Schwartz on the one hand and H. Roy Penzell on the other. There was no meeting of stockholders or directors held prior to the execution of the agreement to sell the stock to the corporation nor was there ever a formal meeting with proper notice given to the other stockholders of a meeting to ratify the agreement.

10. The corporate records include minutes of a meeting dated March 12, 1963, reciting that a special meeting of the directors was held "in pursuance to notice duly waived" on the 12th day of March 1963, at which time the resignations of Benjamin D. Jaffe, Jacob Schwartz, Joseph Jaffe and Melvyn Schwartz as officers and directors of the company were duly accepted. Robert Moran, A. B. Taylor, Clarke Cunningham and Jimmy Penzell were elected, respectively, Vice President of Sales, Vice President of Production, Secretary and Treasurer, and Assistant Secretary and Assistant Treasurer, with salaries to be fixed and determined by the Board at a later date. These minutes were signed by W. Clarke Cunningham as Acting Secretary.

On March 12, 1963, Kenneth Cass was Chairman of the Board, a director and a stockholder. He testified unequivocally that he did not at any time, at either an informal meeting or a formal meeting of the Board, discuss the matter of the corporation's entering into a contract with Messrs. Jaffe and Schwartz, that he received no notice of any meeting held for the purpose of ratifying the contract, did not call any meeting of the Board of Directors and did not attend any such meeting.

Mr. Varnum Wells, President of the corporation, a director and a stockholder, stated flatly that he never attended or received notice of any meeting held for the purpose of considering the purchase of the stock of Messrs. Jaffe and Schwartz and that he had no actual knowledge of what took place until after the transaction. As President of the company he was not asked to execute any documents on behalf of the corporation with regard to the contract and was not aware that $21,500 in cash had been paid by the corporation until after it had been paid out.

W. Clarke Cunningham testified that he did not attend the meeting purportedly held on March 12, 1963, knew nothing about it, had no independent recollection of having signed the minutes but acknowledged his signature and stated that he signed it along with a number of other papers at the direction of Mr. Penzell and Mr. Leatherwood.

I, therefore, find that no meeting of the directors and stockholders of the corporation was held on March 12, 1963, and that the purported contract of sale between B. J. Jaffe and Jacob Schwartz as sellers and Balentine Packing Company as buyer was not adopted pursuant to any action taken by the Board of Directors or the stockholders of the corporation and that the same was never ratified either by the Board or by the stockholders.

11. The sum of $1000 was paid to the defendants Jaffe and Schwartz on March 9, 1963, when the contract was signed. The sum of $14,000 was paid to them on March 13, 1963; and the sum of $6500 was paid to them in April 1963. I further find that on neither of these dates was the corporation able to pay its obligations.

12. I further find that the capital of Balentine Packing Company was impaired by the purchase of the stock from the defendants and that such purchase is, therefore, void. Defendants strenuously contend that if the replacement value as determined by Starr Parker Associates in November 1962 is used to reflect the

true value of the assets, then the capital was not impaired. I do not believe, however, that the replacement value placed by Starr Parker Associates reflects the true value of the assets. In the armslength transaction of August 31, 1962, a willing seller and a willing buyer agreed that $500,000 was the worth of the company. I am conscious that the book value of the South Carolina corporation was in excess of $500,000 but I am also mindful that the South Carolina corporation had attempted for some time to sell and that it was only able to obtain $500,-000 for its assets. I find that the $500,-000 paid by the Delaware corporation was the fair market value of the assets acquired by purchase and that although the reappraisal based on replacement costs made by Starr Parker Associates was not illegal, it still does not, in my judgment, reflect the true value. The capital and surplus were exhausted on March 9, 1963. I, accordingly, find that the capital of the Delaware corporation was impaired by the purchase of the defendants' stock.

13. I, therefore, find that the $21,500 paid by the corporation to the defendants is due the plaintiff, together with interest at the legal rate of six (6%) per cent from the date of payment and that the notes and mortgages given to secure the same by the corporation to the defendants are null and void and should be cancelled of record.

14. I find that the plaintiff is estopped to claim at this time reimbursement for salaries paid the defendants for the reason that such salaries were formally adopted at a stockholders and directors meeting on October 1, 1962, and were made to the defendants pursuant to formal action of the corporation.

15. I further find that the plaintiff has failed to prove that the expenses for which the defendants Benjamin D. Jaffe and Jacob Schwartz were reimbursed by the corporation were excessive or for improper purposes and hence I find that plaintiff is not entitled to judgment for the same.

16. I find that the plaintiff has failed to prove that the attorney's fees paid the defendant Jacob Schwartz were excessive or unreasonable and that plaintiff is not entitled to judgment for the same.

### Conclusions of Law

The parties agree that since this is a Delaware corporation, the power of the corporation to purchase its own stock must be determined by the laws of Delaware.

Title 8, Section 160 of the Delaware Code reads in part as follows:

"Every corporation organized under this chapter may purchase, hold, sell and transfer shares of its own capital stock; but no such corporation shall use its funds or properties for the purchase of its own shares of capital stock when such use would cause any impairment of the capital of the corporation."

The leading case in Delaware interpreting its statute is In re International Radiator Co., 10 Del.Ch. 358, 92 A. 255, 256. The Court in that case stated:

" * * * In the statute the impairment of the 'capital' of the company is mentioned. As here used, this means the reduction of the amount of the assets of the company below the amount represented by the aggregate outstanding shares of the capital stock of the company. In other words, a corporation may use only its surplus for the purchase of shares of its own capital stock. 'Capital' does not in this connection mean the assets of the company, for, of course, the assets are reduced when any of it is used by a corporation to purchase shares of its own capital stock. It must have some other meaning then. The statute must mean, therefore, that the funds and property of the company shall not be used for the purchase * * * of its own capital stock when the value of its assets is less than the aggregate amount of all the shares of its capital stock. A use by a cor-

154

poration of its assets to purchase shares of its own capital stock under such conditions impairs the capital of the company."

In Ashman v. Miller, 6 Cir. 1939, 101 F.2d 85, 90, the decision in In re International Radiator Co., supra, was construed to hold that a Delaware corporation may use only its surplus for the purchase of its capital stock. See also Acker v. Girard Trust Co. et al., 3 Cir. 1930, 42 F.2d 37, in which the Court of Appeals for the Third Circuit cited with approval the decision of the Delaware Court in Re International Radiator Co., supra.

West Virginia has a statute governing the purchase by a corporation of its stock which was taken from the Delaware statute. This code section was construed by the Court of Appeals in Mountain State Steel Foundries, Inc. v. C. I. R., 4 Cir. 1960, 284 F.2d 737.

In that case Judge Haynsworth stated:

"Corporate power to purchase its own stock has been frequently abused. Done by corporations conducting faltering businesses, it has been employed to create preferences to the detriment of creditors and of the other stockholders. It was to protect and preserve the margin of safety supplied by the real value of contributed capital that such statutes were enacted. That purpose is not served if the statute is applied in terms of unrealistic values, whether higher or lower than real values. At least until the highest court of West Virginia should otherwise decide, we think for our collateral purpose the statute should be construed as prohibiting the purchase of its own stock if the use of its funds for the purpose would deplete the realizable value of its assets to a point below the total of its liabilities and capital.

"What little can be found in decided cases applying similar statutes suggests that actual values, rather than book figures, are critical to the inquiry. * * *

"If we are to look to actual values in applying the statute, the spirit of the statute requires that they be conservatively determined. Opinion evidence of appreciation should be received with skepticism if insolvency ensues. * * *

"It is now well-established that the claims of former stockholders under such executory agreements are subordinate to the claims of other creditors existing at the time of performance. When a corporation purchases a portion of its outstanding stock with an agreement to pay for it at a subsequent time, it may not perform its promise if the use of its funds in performance will impair its capital. This is true though earlier performance at the time of consummation of the executory agreement would have occasioned no impairment of the capital."

In view of my finding that the purchase of the stock from Jaffe and Schwartz impaired the capital of the Balentine Packing Company, I must conclude that such purchase was void under the laws of Delaware.

*Recommendations*

I, therefore, recommend that this Court:

(1) Enter judgment in behalf of the plaintiff against the defendants for the sum of Twenty-one Thousand, Five Hundred and no/100 ($21,500.00) Dollars, together with interest at the legal rate of six (6%) per cent from respective dates of payment of such amounts to the defendants.

(2) Declare the notes and mortgages securing the same given by the corporation, Balentine Packing Company, to the defendants null and void.