Farmers and Merchants Investment Co. v. Commissioner.
Farmers & Merchants Inv. Co. v. Commissioner
Docket Nos. 4556-67, 1551-69.
United States Tax Court
T.C. Memo 1970-161; 1970 Tax Ct. Memo LEXIS 193; 29 T.C.M. (CCH) 705; T.C.M. (RIA) 70161; June 22, 1970, filed *193 Petitioner conducted an insurance agency business by selling insurance to the customers of the bank petitionercontrolled. Its insurance policies were sold and its administrative work carried on by the bank employees with petitioner paying the bank $200 a month for such services. Petitioner,during the years in issue, accumulated funds to pay off an earlier loan it had incurred to redeem its stock and the bank interest of one of the two equal stockholders. Petitioner also accumulated funds to pay off the loan it incurred during the years in issue to enable itto acquire the bank's excess assets and thus enable the bank to build a needed bank building. Held, under the particular facts of this case the said loans were incurred in connection with petitioner's business and the accumulations to pay off said loans were within the reasonable needs of petitioner's business and petitioner was not formed or availed of for the purpose of avoiding income tax with respect to its stockholder (who owned over 90 percent of petitioner) within the meaning of section 532, I.R.C. of 1954. Alan L. Austin and Irving A. Hinderaker 318 Midland Nat'l Life Ins. Co. Bldg., Watertown, S. Dak., for the petitioner. *194 Frank C. Conley, Robert F.Cunningham and Glenn L. Strong, for the respondent. 706 MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: Respondent has determined deficiencies in petitioner's income tax for the taxable years as follows: Docket No.
Taxable Year Ended
Deficiency
4556-67
June 30, 1962
$10,512.81
June 30, 1963
12,978.63
June 30, 1964
11,160.60
1551-69
June 30, 1965
11,591.53
June 30, 1966
14,542.00
June 30, 1967
13,115.03
Respondent has conceded there is no tax due under section 531, Internal Revenue Code of 1954[1] for the year ended June 30, 1962. The only issue for decision is whether petitioner is subject to the accumulated earnings tax under section 531 with respect to any of its earnings retained by it during the years left in issue. Findings of Fact Some of the facts have been stipulated and they are so found. Petitioner, Farmers and Merchants Investment Co., is a corporation organized in December 1953, under the laws of the State of South Dakota. Its principal place of business at the time it filed its petitions was Watertown, South Dakota. It filed its Federal income *195 tax returns for the years in issue with the district director of internal revenue, Aberdeen, South Dakota. Ninety-nine and six tenths percent (99.6%) of petitioner's outstanding stock was owned by A. J. Dondelinger during the years in issue. The Farmers and Merchants Bank of Watertown, Watertown, South Dakota, (Bank), is a banking corporation organized and chartered in 1935 under the banking laws of the State of South Dakota for the purpose of engaging in the general commercial banking business. On August 13, 1953, the Bank had 1,000 shares of stock outstanding with total capital at $100,000. Prior to this date the holders of the Bank stock held proportional interests in an unincorporated insurance business operating under the name of Farmers and Merchants Bank Insurance Agency. Ownership of a share of stock in the Bank represented an equal ownership of 1/1000th interest in the insurance agency. Eugene H. Paine and Arthur J. Dondelinger negotiated for the purchase of a controlling interest in the Bank and the insurance agency operated in connection therewith with Andrew Kopperud and Mabel Kopperud who owned 561 shares of the Bank stock. Pursuant to an agreement reached on August 13, *196 1953, Paine and Dondelinger purchased these 561 shares which included the proportional interest in the insurance agency. Following this acquisition they acquired an additional 206 shares of the Bank stock together with its interest in the insurance agency from Herman Kopperud. The total cost of the 767 shares acquired and the proportionate share of the insurance business was $318,291.45. Prior to January 1, 1954, Paine and Dondelinger secured by bill of sale and assignments the interests of the other stockholders in the insurance agency. On January 2, 1954, Paine and Dondelinger transferred 707 shares of the Bank stock, together with the insurance agency, to petitioner in exchange for 1,084 shares of petitioner's capital stock which was divided evenly between the two with the exception of two shares held out for one of the directors of petitioner. Each retained 30 shares of the Bank stock. Petitioner assumed the obligations of Paine and Dondelinger on notes given for the purchase price of the Bank stock in the amount of $209,750. The Bank stock was valued at approximately $313,104. Petitioner also acquired stock from small minority holders and at one time held over 80 percent of such *197 stock of the Bank. During the years involved petitioner owned various amounts of voting stock in the Bank as follows: Fiscal Year
Percent of Voting Stock
1962
59.5
1963
59.9
1964
59.9
1965
59.9
1966
60
1967
65.4
At all times material, Dondelinger served as president and director of petitioner. G. D. Bunce served as secretary-treasurer and director of petitioner until August 1, 1964, and thereafter G. H. Wein served in the same capacity. Paine served as a director of petitioner until his resignation on March 30, 1960. During the years in issue petitioner's controlling stock was owned by Dondelinger. 707 After petitioner was organized it regularly carried on a general insurance agency business. The dollar amount of insurance commissions received by petitioner during the years in issue is as follows: Year
Insurance Commissions
June 30, 1962
$53,636.91
June 30, 1963
51,369.00
June 30, 1964
40,724.00
June 30, 1965
40,383.00
June 30, 1966
52,953.00
June 30, 1967
49,648.00
At all times material petitioner negotiated and executed substantially all agency agreements covering insurance contracts protecting against life, casualty, fire, theft, etc., in the name of Farmers and Merchants Investment Co., d/b/a Farmers and *198 Merchants Insurance Agency. All insurance contracts written or negotiated for petitioner in its capacity as an agent are arranged or written, and collections are made by the employees of the Bank. The Bank charges the petitioner an administrative service charge for conducting the insurance operation of $200 a month. From the time Paine and Dondelinger acquired control of the Bank in 1953 until 1960, Paine served as the Bank's president. Dondelinger served as the vice president from that time through the date of trial. In the latter part of 1959 Paine, who had been operating the Bank as the president thereof and the principal managing officer, demanded that Dondelinger purchase his interest in the Bank and the petitioner or sell his interest in the Bank and the petitioner to him. On or about January 15, 1960, he made a written offer to Dondelinger for a buy or sell settlement. Paine was insisting upon his interests in the Bank and the petitioner being purchased or that Dondelinger sell his interests to Paine. Dondelinger decided to keep the Bank and the petitioner for himself. He had petitioner effect a redemption of Paine's stock in petitioner and he had petitioner buy Paine's bank *199 stock. In order to effect the purchase of stock in the Bank held by Paine and to effect the stock redemption of 541 shares of the petitioner held by Paine in March 1960, the petitioner borrowed $250,000 from the Marquette National Bank in Minneapolis. A portion of this indebtedness was unpaid during each of the fiscal years ending June 30, 1962, June 30, 1963 and June 30, 1964. All Bank loans were listed as short-term six-months' notes. Deposits in the Farmers and Merchants Bank increased about a million dollars per year during the period 1962 through 1968, and in 1967 there was an increase of approximately two million dollars. The total assets of the Farmers and Merchants Bank of Watertown ranged from ten million dollars on June 30, 1962, to over seventeen million dollars on June 30, 1968. The Bank's annual net profit ranged from $20,000 to over $87,000 during the years in issue. Prior to 1955 the Farmers and Merchants Bank had never paid an annual dividend in excess of $12,000. From 1955 through 1961 the Bank paid annual dividends ranging from $25,000 to $29,375, and in 1962 the Bank paid a dividend of $50,000. The Bank paid dividends during the years 1963 through 1967 ranging from *200 $31,250 to $37,500 annually. The petitioner's share of the dividends paid by the Farmers and Merchants Bank in 1962 amounted to $14,880. Petitioner's share of these dividends for each of the years 1963 through 1967 averaged approximately $22,500. During the years in issue the Farmers and Merchants Bank officers and directors were actively seeking to remodel, expand or relocate the Bank's facilities. In its first effort to expand, the Bank purchased the Singer property, which is one-half block east of the Bank. An option was also obtained on the Gray building, which was between the Bank and the Singer property. The Singer Building was subsequently resold to an unrelated third party by the Bank, and the option on the Gray Building was permitted to expire. After abandoning the idea of expanding to the east, the Bank's directors looked south of the Bank building. They obtained an option on the Baxter Building, adjacent to the Bank on the South, and purchased the Wedgewood Building, immediately beyond the Baxter Building, for $25,000. The Wedgewood Building was never utilized for banking purposes, and the option on the Baxter Building was permitted to expire. After abandoning plans to use *201 the Wedgewood and Baxter Buildings, the Bank directors decided to purchase certain properties owned by the Chicago and Northwestern Railroad known as the Watertown Potato Co. and the Skinner Building. The Bank purchased these properties for approximately $75,000, and immediately took steps to build a new bank building on that site. Because of South Dakota's State banking laws, which limit bank investment in building and equipment to 40 percent of capital and surplus, the Bank was initially 708 prohibited from building the new bank structure. To solve this problem the petitioner purchased from the Bank a portion of the land and banking equipment, the old bank building, and the Wedgewood Building. In order to do this it borrowed from the Marquette National Bank in March, June and December 1965, $28,000, $64,000 and $90,000, respectively. All these loans were listed as short-term six-months notes. The Farmers and Merchants Bank occupied its new banking facilities on October 4, 1965. The banking facilities were leased to the Bank with provisions for the Bank to purchase the property back from the petitioner at its cost. The Bank reacquired much of this property approximately two years *202 later and at the time of trial owned its full banking facilities. During the years in issue, petitioner's principal sources of income were (1) insurance commissions, (2) dividends on the stock of Farmers and Merchants Bank, and (3) rents (for the fiscal years ending June 30, 1966 and June 30, 1967). Petitioner's gross income and net profit for each of the years ending June 30, 1957 through June 30, 1967 were as follows: Year Ending
Gross Receipts
Net Profit
June 30, 1957
$ 72,436
$33,965
June 30, 1958
75,678
39,542
June 30, 1959
75,704
31,971
June 30, 1960
79,210
47,414
June 30, 1961
84,752
67,223
June 30, 1962
68,696
54,428
June 30, 1963
75,882
64,535
June 30, 1964
61,982
51,640
June 30, 1965
63,720
34,895
June 30, 1966
98,118
47,296
June 30, 1967
106,814
45,203
Throughout petitioner's entire history, its balance sheet has reflected substantial liabilities owed to Minneapolis banks and captioned "Notes Payable." These debts were secured by petitioner's shares of Farmers and Merchants Bank stock. The debts owed to Marquette National Bank (and later, the First National Bank of Minneapolis) were evidenced by promissory notes maturing in six months. However, the Marquette National Bank renewed the balance of the principal *203 debt every six months. On March 8, 1967, the First National Bank of Minneapolis took over petitioner's loan from the Marquette National Bank, in the amount of $200,000. Petitioner reduced the principal on this loan by $30,000 during the succeeding two-year period, and on December 17, 1968, the First National Bank's officers' comment sheet disclosed that there was no planned liquidation program with respect to this debt. During the years in issue petitioner had the following assets and liabilities: ASSETS
6-30-62
6-30-63
6-30-64
6-30-65
6-30-66 *
6-30-67
Cash
$28,189.16
$20,952
$8,690
$13,390
$25,543
$21,129
Receivables
18,164.81
21,903
20,233
19,172
24,447
34,842
Capital Stock, F & M Bank
289,099.25
292,916
292,916
292,916
293,616
354,586
Land
$102,666
145,886
145,886
Depreciable Assets
1,250.00
1,250
1,250
21,250
120,137
121,002
(Depreciation Reserve)
(1,250.00)
(1,250)
(1,250)
(1,250)
(10,932
(23,271)
Other Assets
3,572
4,852
7,446
8,425
Good Will 5,421.71
5,422
5,422
5,422
5,422
5,422
TOTAL ASSETS $340,874.93
$341,193
$330,833
$458,418
$611,565
$668,023 **
LIABILITIES
Notes Payable, Banks
$155,600.00
$115,600
$73,000
$155,000
$245,000
240,400
Accounts Payable
27,652.05
23,746
16,135
19,660
23,671
33,548
Accrued Income Taxes
16,253.78
17,340
Accrued Expenses 1,867.03
1,275
13,966
14,926
22,253
26,835
TOTAL LIABILITIES $201,372.86
$157,961
$103,101
$189,586
$290,924
300,783
CAPITAL 6-30-62
6-30-63
6-30-64
6-30-65
6-30-66 *
6-30-67
Capital Stock
108,400.00
108,400
108,400
108,400
54,300
54,300
Capital Surplus
141,45
141
141
141
141
141
Earned Surplus
273,960.62
317,691
362,191
403,291
266,200
312,799
Treasury Stock
(243,000.00)
(243,000)
(243,000)
(243,000)
TOTAL LIABILITIES & CAPITAL $340,874.93
$341,193
$330,833
$458,418
$611,565
$663,023
*204 709 Corrected Earned Surplus and Outstanding Bank Indebtedness to theMinneapolis Banks as of:
Earned Surplus
Bank Indebtedness
June 30, 1962 ($273,960.62 minus $188,900)
$85,060.62
$155,600
June 30, 1963 ($317,691 minus $188,900)
173,291.00
73,000
June 30, 1965 ($403,291 minus $188,900)
214,391.00
155,000
June 30, 1966
266,200.00
245,000
June 30, 1967
312,799.00
240,400 On January *205 15, 1964, petitioner loaned A. J. Dondelinger $12,000. This amount was repaid in April 1964. On March 31, 1965, petitioner loaned Northern Motors, Inc. $51,000. This company was a Chevrolet dealership which was controlled by Dondelinger's son. Subsequently, in June 1965, this loan was repaid to petitioner. For each of the calendar years 1962 through 1966, Dondelinger reported sufficient income to be taxed at rates ranging from a low of 44.5 percent to a high of 59 percent. The petitioner has never declared or paid a dividend on its stock. Respondent, in the notices of deficiency, determined that petitioner was availed of for the purpose of avoiding income tax with respect to its stockholders by permitting its earnings and profits for the years in issue to accumulate instead of being divided or distributed. In said notices he determined that "all of [petitioner's] earnings and profits * * * were permitted to accumulate beyond the reasonable needs of its business, including the reasonably anticipated needs thereof." Respondent concedes that the stock redemption, which occurred in 1960, reduced the earnings and profits of petitioner by $188,900. Consequently, respondent concedes that *206 there is no tax due under section 531 for the taxable year ended June 30, 1962, because petitioner's earnings and profits did not exceed $100,000 in such year. Opinion Respondent determined petitioner was availed of during the taxable years ended June 30, 1962, 1963, 1964, 1965, 1966 and 1967 for the purpose of avoiding the income tax with respect to its shareholders through the medium of permitting its earnings or profits to accumulate beyond the reasonable needs of the business instead of being distributed and it was therefore subject to the 710 accumulated earnings tax imposed by sections 531 and 532. [2] *207 Section 533 provides that: "For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary." Section 537 provides the term "reasonable needs of the business" includes "the reasonably anticipated needs of the business." Petitioner contends there was no accumulation of earnings and profits during the years in issue beyond the reasonable needs of its business. Petitioner argues the need to repay its bank loans to the Marquette National Bank in Minneapolis and later the First National Bank of Minneapolis, who took over petitioner's loans from Marquette National Bank, justified its surplus accumulations. These bank loans were incurred in connection with the redemption of Paine's stock and the acquisition of certain property and fixtures owned by the Watertown bank that petitioner *208 controlled. Section 1.537-2, Income Tax Regs., states with respect to grounds for accumulation of earnings and profits that whether a particular ground for the accumulation of earnings and profits indicates such accumulation is for the reasonable needs of the business or beyond such needs is dependent upon the particular circumstances of the case. The regulation goes on to list in subparagraphs (b) and (c) "some of the grounds which may be used as guides under ordinary circumstances." Subparagraph (b) of said regulation provides in pertinent part: (b) Reasonable accumulation of earnings and profits. Although the following grounds are not exclusive, one or more of such grounds, if supported by sufficient facts, may indicate that the earnings and profits of a corporation are being accumulated for the reasonable needs of the business provided the general requirements under §§ 1.537-1 and 1.537-3 are satisfied: * * * (3) To provide for the retirement of bona fide indebtedness created in connection with the trade or business, such as the establishment of a sinking fund for the purpose of retiring bonds issued by the corporation in accordance with contract obligations incurred on issue; *209 The above regulation as applied in this case means that an accumulation will be considered to be for the reasonable needs of the business if used to retire bona fide debts created in connection with the carrying on of a petitioner's business. See also Jacob Sincoff, Inc. 20 T.C. 288 (1953), affd. 209 F. 2d 569 (C.A. 2, 1953). It is respondent's position that the loans from the Minneapolis banks were not debts that were created or incurred in connection with petitioner's trade or business and therefore accumulations to pay the loans were not within the reasonable needs of petitioner's business. Respondent also argues that if said bank loans should be considered in determining petitioner's business needs then no more than 20 percent of said loans should be classified as current liabilities. Prior to the formation of petitioner the insurance agency was operated as a partnership consisting of the stockholders of the bank. Paine and Dondelinger by equal contributions acquired all of the stockholders' partnership interests in the insurance agency and 767 shares of the bank's stock. When petitioner was formed in January of 1954 by Paine and Dondelinger they transferred the insurance agency *210 and 707 shares of bank stock to petitioner in exchange for 1,084 shares of petitioner's capital stock. The stock was issued as follows: 541 shares to Paine, 541 shares to Dondelinger, and two shares to a director named George Bunce selected by them. Petitioner assumed the note obligations of Paine and Dondelinger incurred in purchase of the bank stock and their equity in the bank stock transferred to petitioner was approximately $108,400. Petitioner began business in 1954 owning capital stock of the Bank valued at $313,104.33 with note obligations of $209,750. 711 In the latter part of 1959 Paine, who had been operating the bank as president and principal managing officer, decided to end his relationship with Dondelinger. He said this decision was prompted somewhat by the fact that Dondelinger, who was 73 years old, was some 20 years older than he was; that they had a buy-sell agreement in case of death whereby the survivor was to buy out the estate of the deceased and if their business continued to grow it would require too large a loan for him if he was survivor. On November 24, 1959 Paine wrote a letter to Dondelinger offering him a buy or sell agreement with respect to their Watertown *211 holdings. Paine's letter stated that they had had a fine relationship but went on to state: "I think that it is time that we separated from an economic standpoint alone." Paine testified that he and Dondelinger had talks about separating and Dondelinger did not want to execute the buy or sell agreement. He testified: "Well, he just asked me * * * what I would do if he didn't elect to do either buy or sell, and I said, 'well, that would have to remain to be seen what I would do, but I would suggest that he execute it either one way or the other.'" Dondelinger said he was "satisfied the way it was" but Paine "just insisted" that he either buy or sell and he finally executed the buy or sell agreement in favor of buying, through petitioner, Paine's interest in the bank and in petitioner. These interests were acquired by petitioner in 1960 at a price of $13,200 for the bank stock and $243,000 for Paine's 541 shares of petitioner's stock. To finance these purchases petitioner borrowed $250,000 from the Marquette National Bank in Minneapolis and agreed to make the lending bank the correspondent bank for the Farmers and Merchants Bank. The debt was evidenced by a promissory note maturing in *212 six months, however, the Marquette National Bank was expecting a principal reduction of 10 percent each six months and it expected to renew the balance of the principal debt each six months if everything was satisfactory. There was still $115,600 of this debt owing to the Marquette National Bank as of June 30, 1963, and the surplus was $128,791. There was still $73,000 of this debt owing to the Marquette National Bank as of June 30, 1964 and the surplus was $173,291. Petitioner argues it was entitled to accumulate additional surplus in 1963 and 1964 to pay off the bank debts remaining unpaid in those years. Respondent argues the $250,000 bank debt which was incurred to buy out Paine's interest was not incurred in connection with petitioner's business. It appears from the evidence that Paine was either a 50 percent stockholder or a minority stockholder, depending upon how the two shares held by George Bunce would be voted. It has generally been held that in a closely held corporation the accumulation of surplus to acquire the stock of a 50 percent stockholder or minority stockholders serves a valid business need as conflict of interest amongst shareholders adversely affects the operation *213 of the corporate business. Gazette Pub. Co. v. Self, 103 F. Supp. 779 (D.C. Ark. 1952); Mountain States Steel Foundries, Inc. v. Commissioner, 284 F. 2d 737 (C.A. 4, 1960), and Dill Manufacturing Co., 39 B.T.A. 1023 (1939). The promotion of harmony in the conduct of the business is a proper business purpose. If redeeming the stock of one stockholder in a closely held corporation is designed to secure it against dissension amongst those who determine business policy, the redemption is justified as a business need. In Gazette Pub. Co. v. Self, supra, it was held the purchase of the minority stock even at an advanced price was a "reasonable need" of the business where the record showed that not to purchase "could and probably would have been most disruptive of the harmony of the corporation." The opinion holds the borrowing of $600,000 to accomplish the redemption was justified. In Mountain States Steel Foundries, Inc., supra, the widow and daughter who inherited a large block of stock in a closely held corporation were demanding that they be bought out or the business sold. The majority stockholder elected to buy them out and it was held the redemption of the stock of the widow and *214 her daughter fulfilled a business need. The opinion holds the accumulation in the year of the redemption and subsequent years to discharge the indebtedness incurred by reason of the redemption was proper. In the instant case the redemption was made two years before the earliest year involved but we hold the redemption was for business need and therefore it was proper to accumulate surplus in later years as long as it was to discharge the indebtedness incurred in connection with the redemption. The record shows petitioner's insurance business consisted of furnishing all types of insurance coverage needed by the Bank's 712 customers that made bank loans. Paine testified "we wrote a substantial volume of crop hail insurance in the spring of the year for farmers. This was a type of insurance that very, very few agents other than bank agents wrote because it took a substantial amount of capital to write it. You had to carry the farmers from spring [until] fall. You had to pay the insurance companies daily, and because the bank had lines of credit to the farmers we were covered by their chattel mortgages, * * * we were able to give them advances under the protection of the crop mortgage *215 for the purchase of the hail insurance * * *." He went on to say petitioner wrote "[credit] life insurance * * * in connection with the consumer credit loans * * * that protect the bank" by paying off the indebtedness in case of death or disability of the borrower. He said petitioner wrote automobile insurance when a bank customer wanted to finance an automobile and did not have such coverage and likewise real estate insurance in connection with real estate loans. Paine said that "the continued renewal of this business was substantial." Petitioner was able to operate its insurance business without any advertising and without any employees soliciting the sale of policies. During the years in issue Dondelinger served as president and director of petitioner at a salary of $2,400 a year. The only other employees during the years in issue was G. D. Bunce, who served as secretary-treasurer and director until August 1, 1964 at a salary of $50 a month. After August 1, 1964 G. H. Wein served in the same capacity at the same salary. Petitioner paid the bank $200 a month for services rendered by the bank employees in connection with the insurance operation and the collection of the insurance *216 commissions. When the bank was acquired in 1953 the three-story bank building was approximately 100 years old. It had been somewhat remodeled in 1915 and while Paine was president (1953-1960) the lower story was completely resurfaced on the outside and remodeled on the inside. The bank's competitor bank was located across the street in a good building with a drive-in facility. The Farmers and Merchants bank was able to have a walk-up window installed in the old bank building but this was not satisfactory. As pointed out in our findings of fact, the bank in its early effort to expand and then to relocate purchased two buildings and took options on others which it permitted to expire. These all proved to be false starts. After receiving estimates from architects and engineers and further evaluating these properties they were all abandoned as unsuitable for the purpose for which they were acquired. Finally, the bank bought the lots on the railroad right-of-way and the officers decided this was the best location for the new bank building. The next problem was the matter of financing the new bank building. This arose because of the State banking law which would only allow 40 percent of *217 a bank's capital to be put into bank facilities. The problem was solved by having petitioner buy the railroad right-of-way land and the bank fixtures and agree to lease the land and the bank fixtures to the bank at 5 percent on the investment with the right to purchase the land and fixtures at cost. Petitioner also purchased at the bank's cost other buildings and land that had been acquired by the bank but abandoned as expansion or relocation sites. All of these purchases were made by petitioner to enable the bank to build its new building on the ground it was renting from petitioner and still stay within the 40 percent of capital and surplus. In order to make the purchases of the bank's properties petitioner in March, June and December of 1965 borrowed $28,000, $64,000 and $90,000, respectively, from the Marquette National Bank. These debts were also evidenced by promissory notes maturing in six months and the Marquette National Bank was expecting a reduction of only 10 percent every six months and it expected to renew the balance of the principal debts every six months if everything was satisfactory. As of June 30, 1965, the debt to the Marquette National Bank had been increased *218 to $155,000 and the surplus as of that date was $214,391. As of June 30, 1966, the debt to the Marquette National Bank had been increased to $245,000 and the surplus as of that date was up to $266,200. The increases in the debts to the Marquette National Bank shown above in the fiscal years ended June 30, 1965 and 1966 resulted from petitioner's borrowings in those fiscal years to finance petitioner's purchases of property and banking facilities to aid the bank it controlled. As of June 30, 1967, the bank indebtedness stood at $240,400 and the surplus was $312,799. 713 It is petitioner's argument that because of its close relationship with the bank its Marquette National Bank loans made in the year 1965 to aid the bank secure a new building were debts created in connection with the carrying on of its business and therefore under § 1.537-2(b)(3), Income Tax Regs., the accumulation to repay the debts should be considered for the reasonable needs of petitioner's business. Respondent argues petitioner's purchase of the bank's property to enable the bank to build a new bank building was not a part of the reasonable needs of petitionerinsurance agency business. He points out that even though *219 petitioner owned a controlling interest in the bank the bank is not to be considered an instrumentality of petitioner under § 1.537-3, Income Tax Regs.[3] *220 set forth below, because petitioner did not, during the years in issue, own 80 percent of the bank's stock and purchasing of bank excess assets by petitioner to aid the bank's expansion plans was not required in the business operations of petitioner's insurance agency; that the debts incurred to finance petitioner's purchase of the bank's assets in order to enable the bank to secure a new building cannot be considered debts incurred in connection with the carrying on of petitioner's insurance business; and the repayment of such debts is not within the reasonable needs of petitioner's insurance business. The record shows that petitioner at all times had complete and effective control of the bank and this enabled it to enjoy a lucrative captive insurance business. It was *221 this ownership and control of the bank that made it possible to have an arrangement with the bank where the bank employees performed the mechanical functions and did most all of the administrative work required for the carrying on of petitioner's insurance business at minimal expense to petitioner. Petitioner argues its ownership and control of the bank free from debt so as to control the captive insurance business was essential to petitioner's business; that the bank's propsperity was essential to petitioner's prosperity; that a valid business purpose of petitioner was served by its acquiring the bank's excess property and banking facilities when that acquisition enabled the bank to acquire a needed new building; that the debt created to finance the said acquisition was, because of the close relationship of the bank and petitioner and the captive character of its insurance business, actually created in connection with petitioner's business; and therefore it was proper to accumulate surplus to discharge the indebtedness incurred in connection with said acquisition. Under South Dakota law, banks are forbidden from engaging in any business activity other than banking. Campbell County State Bank, Inc., 37 T.C. 430 (1961), *222 reversed on another issue 311 F. 2d 374 (C.A. 8, 1963). In the cited case the stockholders who controlled the South Dakota bank formed a partnership to carry on the insurance business much like the partnership of the bank's stockholders in the instant case that preceded the formation of petitioner. The opinion points out that under South Dakota banking law (S.D.C. sec. 6.0304 (1939) now SDCL 1967, 51-3-7), the only way the insurance business could be carried on was by a separate entity because the State banking law forbids banks from engaging in any business activity other than banking. In the course of the opinion we stated: A bank which carries on other activities is liable to loss of its charter. [4] *223 Under South Dakota law, therefore, the two types of activities (banking and insurance) are required to be performed by separate entities. [Footnote 4 omitted]. It is true that petitioner did not, during any of the years in issue, own 80 percent 714 of the bank's stock. But ownership of 80 percent of one corporation by another corporation merely establishes the first corporation as a "mere instrumentality" of the second. § 1.537-3(b), Income Tax Regs. In House Rept. No. 1337, 83d Cong. 2d Sess., p. 53, appears the following: Your committee is of the opinion that where the taxpayer has 80 percent or more of the voting stock of another corporation, the taxpayer should be viewed as though it engaged directly in the business of such other *224 corporation. If the taxpayer's ownership of stock is less than 80 percent in such other corporation, a factual determination should be made as to whether the funds so invested are employed in a business operated by the taxpayer. * * * Petitioner's lack of 80 percent ownership of the bank's stock merely means there must be a factual determination based on the particular circumstances of this case as to whether its funds, that were admittedly employed to help secure the new bank building, can be said to have been employed in the insurance business operated by petitioner. We hold they were so employed. Under the particular circumstances of this case petitioner is operating an insurance business that would, in the absence of banking law restrictions, be ordinarily carried on by the bank. This means that the business operation of petitioner can well be said to include activities which would also aid the bank. Petitioner's insurance agency is not the ordinary concept of an agency employing salesmen to sell policies. It is the operation of a ready-made insurance business which is created by and tied to the bank's business. The bank was not to to be the sole business occupant of the new building *225 that was being acquired by the use of petitioner's funds. Petitioner carried on its insurance business in the building its funds helped secure. [4] *226 It would be hard to imagine a situation where the business operation of one corporation would so clearly extend to the business of its controlled corporation. The two business entities shared the same business premises and the same customer group in that petitioner's business was operating in the bank building and furnishing insurance coverage to the bank's customers. We hold under the particular facts of this case that petitioner's funds were employed in its business when used to buy the bank's unneeded assets and thereby enable the bank to build its bank building. This means the debts created by petitioner in 1965 in connection with such purchase of the bank's properties were created in connection with the carrying on of petitioner's business and accumulations to pay said debts will be for the reasonable needs of petitioner's business under § 1.537-2(b), Income Tax Regs. Petitioner had a right to accumulate surplus to pay debts to the Minneapolis banks that were incurred in its business operation. The debts to the Minneapolis banks were not long-term debts as respondent argues. They were short-term debts due in six months even though a 10 percent or 20 percent annual payment on principal was all that was expected and there was an oral understanding that the lending banks would, if everything *227 was satisfactory, renew the balance due on the loans every six months. The vice president of the Marquette National Bank testified that it was correct to say that "the purpose of making the loans mature in six months [was] so that if the loans became unsatisfactory [the Marquette National Bank] could call the line." It appears that satisfactory meant the loan with accompanying correspondent business would show a profit to the lender. As a matter of fact, the Marquette National Bank did find its yield too low on its loans and correspondent's business with petitioner. In 1967 it notified petitioner it would have to have larger correspondent's balances or it would have to increase the interest rate on the note. As a result of its demands petitioner paid off its loan at the Marquette National Bank with the proceeds of the loan from the First National Bank. 715 We have previously held that the debts incurred with the Minneapolis banks were incurred in connection with petitioner's business. This means the accumulation of surplus to pay the debts would be within the reasonable needs of petitioner's business. And we are of the opinion the accumulation each year in an amount to pay the full *228 amount of the outstanding debts to the lending banks would be within the immediate business needs of petitioner during the years involved. By the operation of the one hundred thousand dollar minimum credit provided for in section 535(c), taken together with amount of the reasonable needs of the business, the accumulated taxable income for each of the years in issue would be zero or almost zero for each of the years involved. The Montgomery Co., 54 T.C. - (May 14, 1970). For the first year involved here (1962) the accumulated surplus stood at less than $100,000 and respondent concedes petitioner had no burden with respect to this year and no tax is due for 1962. We have held petitioner sustained its burden of proving the accumulations for the remaining five years in the amounts of the outstanding debts was justified as within the reasonable needs of the business. As shown by the schedules in our findings of fact, the accumulations for each of the years ended June 30, 1963, 1964, 1965, 1966 and 1967, stood at less than the sum of $100,000, plus the outstanding bank debts each year, with the exception of the year 1964 when the surplus was less than $300 more than the bank debt plus $100,000. *229 We hold on the basis of the entire record that petitioner was not formed or availed of for the purpose of avoiding income tax with respect to its stockholder within the meaning of section 532. Decisions will be entered for the petitioner. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
*. Treasury Stock eliminated by the following bookkeeping entry on petitioner's books: Dr.
Cr.
Common Stock
$ 54,100
Earned Surplus
188,900
Treasury Stock
$ 243,000
While the balance sheets of the petitioner carried the 541 shares of the petitioner that were redeemed as treasury stock until 1966, in fact there had been a valid legal redemption of the stock and in each of the fiscal years ended June 30 through the years 1960 through 1965 the capital stock of the petitioner should have beenshown as $54,300 and the earned surplus should have been shown as a figure $188,900 less than was actually shown. This means the earned surplus as of June 30 for the years involved will be as shown in the following schedule which also shows the outstanding indebtedness each year. ↩
**. This figure was stipulated to be $668,023. The actual total is $668,021.↩
2. SEC. 531. IMPOSITION OF ACCUMULATED EARNINGS TAX. In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the accumulated taxable income (as defined in section 535) of every corporation described in section 532, an accumulated earnings tax * * *. SEC. 532. CORPORATIONS SUBJECT TO ACCUMULATED EARNINGS TAX. (a) General Rule. - The accumulated earnings tax imposed by section 531 shall apply to every corporation (other than those described in subsection (b)) formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed.
3. § 1.537-3. Business of the corporation. - (a) The business of a corporation is not merely that which it has previously carried on but includes, in general, any line of business which it may undertake. (b) If one corporation owns the stock of another corporation and, in effect, operates the other corporation, the business of the latter corporation may be considered in substance, although not in legal form, the business of the first corporation. However, investment by a corporation of its earnings and profits in stock and securities of another corporation is not, of itself, to be regarded as employment of the earnings and profits in its business. Earnings and profits of the first corporation put into the second corporation through the purchase of stock or securities or otherwise, may, if a subsidiary relationship is established, constitute employment of the earnings and profits in its own business. Thus, the business of one corporation may be regarded as including the business of another corporation if such other corporation is a mere instrumentality of the first corporation; that may be established by showing that the first corporation owns at least 80 percent of the voting stock of the second corporation. If the taxpayer's ownership of stock is less than 80 percent in the other corporation, the determination of whether the funds are employed in a business operated by the taxpayer will depend upon the particular circumstances of the case. * * *
4. In Campbell County State Bank, Inc., supra, the operation of the South Dakota Bank and the operation of the insurance agency was about the same as here. There the insurance agency was a partnership entity with the bank's controlling stockholders as the partners. It was respondent's position in that case that the relationship was so close "there is no distinction in practice between Bank and Insurance, and that Bank and Insurance were operated as one * * *." There was no appeal in this case from our holding that the separate identity of the two organizations had to be recognized for tax purposes. However, the opinions in this Court 311 F. 2d 374↩) both recognized that there was a close relationship between the two entities. Both opinions held the insurance entity's control of the bank and the merged business operations of the two organizations conducted on the bank's premises required a fair allocation of their shared business expenses.
4. In Campbell County State Bank, Inc., supra, the operation of the South Dakota Bank and the operation of the insurance agency was about the same as here. There the insurance agency was a partnership entity with the bank's controlling stockholders as the partners. It was respondent's position in that case that the relationship was so close "there is no distinction in practice between Bank and Insurance, and that Bank and Insurance were operated as one * * *." There was no appeal in this case from our holding that the separate identity of the two organizations had to be recognized for tax purposes. However, the opinions in this Court 311 F. 2d 374) both recognized that there was a close relationship between the two entities. Both opinions held the insurance entity's control of the bank and the merged business operations of the two organizations conducted on the bank's premises required a fair allocation of their shared business expenses.